MICHAEL J. STORTZ (State Bar No. 139386)
Michael.Stortz@dbr.com
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, California 94105-2235
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Attorneys for Defendants
COMCAST OF ALAMEDA, INC.; COMCAST OF
CALIFORNIA II, INC.; COMCAST OF CALIFORNIA
III, INC.; COMCAST OF CALIFORNIA IX, INC.;
COMCAST OF CALIFORNIA V, INC.; COMCAST OF
CALIFORNIA VI, INC.; COMCAST OF CALIFORNIA
X, INC.; COMCAST OF CALIFORNIA XIII, INC.;
COMCAST CORPORATION; COMCAST OF FRESNO,
INC.; COMCAST OF MARIN I, INC.; COMCAST OF
MARIN II, INC.; COMCAST OF NORTHERN
CALIFORNIA I, INC.; COMCAST OF NORTHERN
CALIFORNIA II, INC.; COMCAST OF
SACRAMENTO I, LLC; COMCAST OF
SACRAMENTO II, LLC; COMCAST OF SAN
LEANDRO, INC.; COMCAST OF SIERRA VALLEYS,
INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JON HART, On Behalf of Himself and All Others Similarly Situated, and On Behalf of the General Public, | Case No. C-07-06350 PJH |
| Plaintiff, | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| COMCAST OF ALAMEDA, INC.; COMCAST OF CALIFORNIA II, INC.; COMCAST OF CALIFORNIA III, INC.; COMCAST OF CALIFORNIA IX INC.; COMCAST OF CALIFORNIA V INC.; COMCAST OF CALIFORNIA VI INC.; COMCAST OF CALIFORNIA X INC.; COMCAST OF CALIFORNIA XIII INC.; COMCAST CORPORATION; COMCAST OF FRESNO, INC.; COMCAST OF MARIN I, INC.; COMCAST OF MARIN II, INC.; COMCAST OF NORTHERN CALIFORNIA I, INC.; COMCAST OF NORTHERN CALIFORNIA II, INC.; COMCAST OF SACRAMENTO I, LLC; COMCAST OF SACRAMENTO II, LLC; COMCAST OF SAN LEANDRO, INC.; COMCAST OF SIERRA VALLEYS, INC.; and DOES 1-250, | Date:    May 21, 2008<br>Time:    9:00 a.m.<br>Dept:    Courtroom 3<br>Judge:   The Honorable<br>          Phyllis J. Hamilton |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    BACKGROUND.................................................................................................. 3

    A.     Comcast's P2P Management Is Necessary ..................................................... 3

    B.     Comcast's P2P Management Is Reasonable ................................................... 5

    C.     Comcast's P2P Management is Disclosed ...................................................... 8

III.   DISCUSSION .................................................................................................... 10

    A.     Mr. Hart's Claims Are Within The FCC's Primary Jurisdiction ................ 10

    B.     Mr. Hart's Claims Are Preempted By Federal Law..................................... 13

    C.     Mr. Hart's Claims Fail As A Matter of State Law....................................... 16

        1.     Comcast's Conduct Is Not "Unfair" .................................................. 16

        2.     Comcast's Conduct Is Not "Unlawful"............................................... 18

        3.     Comcast's Advertisements Are Not "Untrue or Misleading".......... 21

        4.     Comcast Did Not Breach Any Contractual Duty to Mr. Hart ........ 24

        5.     Comcast Did Not Breach Any "Implied" Duty to Mr. Hart ........... 24

IV.    CONCLUSION ................................................................................................. 25

# **TABLE OF AUTHORITIES**

## **DECISIONS**

*AT&T Corp. v. City of Portland*,
216 F.3d 871 (9th Cir. 2000) .................................................. 10-11, 25

*Acoustics, Inc. v. Trepte Construction Co.*,
14 Cal. App. 3d 887 (1971) .................................................. 24

*In re All Terrain Vehicle Litigation*,
771 F. Supp. 1057 (C.D. Cal. 1991) .................................................. 22

*America Booksellers Foundation v. Dean*,
342 F.3d 96 (2d Cir. 2003) .................................................. 16

*America Civil Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) .................................................. 16

*America Libraries Associate v. Pataki*,
969 F. Supp. 160 (S.D.N.Y 1997) .................................................. 16

*In re Amendment of Parts 1, 21, 73, 74 and 101 of the Commission's Rules
to Facilitate the Provision of Fixed and Mobile Broadband Access,
Education and Other Advanced Services in the 2150-2162 and 2500-
2690 MHz Bands*,
18 F.C.C.R. 6722 (2003) .................................................. 14

*American Tobacco v. Patterson*,
456 U.S. 63 (1982) .................................................. 21

*Anunziato v. eMachines, Inc.*,
402 F. Supp. 2d 1133 (C.D. Cal. 2005) .................................................. 22

*In re Appropriate Framework for Broadband Access to the Internet Over
Wireline Facilities*,
20 F.C.C.R. 14853 (2005) .................................................. 11

*In re Appropriate Framework for Broadband Access to the Internet over
Wireline Facilities*,
20 F.C.C.R. 14986 (2005) .................................................. 1, 5, 18

*Appropriate Framework for Broadband Access to the Internet Over
Wireline Facilities, Universal Service Obligations of Broadband
Providers*,
17 F.C.C.R. 3019 (2002) .................................................. 15

*Arthur J. Gallagher & Co. v. Edgewood Ptnrs. Insurance Ctr.*,
No. 07-06418, 2008 U.S. Dist. LEXIS 8924 (N.D. Cal. 2008) .................................................. 20

*Balfour, Burthrie & Co. v. Gourmet Farms*,
108 Cal. App. 3d 181 (1980) .................................................. 25

*Bardin v. DaimlerChrysler Corp.*,
136 Cal. App. 4th 1255 (2006) .................................................. 17

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

ii

*In re Broadband Industry Practices, NOI,*
22 F.C.C.R. 7894 (2007).................................................................................... 10, 11

*Brock v. Cathedral Bluffs Shale Oil Co.,*
796 F.2d 533 (D.C. Cir. 1986).................................................................................... 18

*Caro v. Proctor & Gamble,*
18 Cal. App. 4th 644 (1998) ...................................................................................... 22

*Cedar Rapids v. Garret F.,*
526 U.S. 66 (1999)...................................................................................................... 21

*Cel-Technology Commc'ns, Inc. v. L.A. Cellular Telegraph Co.,*
20 Cal. 4th 163 (1999)................................................................................................ 17

*Center for Democracy and Technology v. Pappert,*
337 F. Supp. 2d 606 (E.D. Pa. 2004)......................................................................... 16

*Chavez v. Whirlpool Corp.,*
93 Cal. App. 4th 363 (2001) ...................................................................................... 17

*Cipollone v. Liggett Group,*
505 U.S. 504 (1992).............................................................................................. 13, 16

*Consumer Advocates v. Echostar Satellite Corp.,*
113 Cal. App. 4th 1351 (2003) .................................................................................. 22

*Edwards v. Marin Park, Inc.,*
356 F.3d 1058 (9th Cir. 2004) ................................................................................... 22

*Federal  Power Commission v. La. Power & Light Co.,*
406 U.S. 621 (1972).................................................................................................... 10

*Foothill Properties v. Lyon Copley Corona Associates,*
46 Cal. App. 4th 1542 (1996) .................................................................................... 25

*GTE.net LLC v. Cox Commc'ns, Inc.,*
185 F. Supp. 2d 1141 (S.D. Cal. 2002)...................................................................... 10

*Gibbons v. Ogden,*
22 U.S. (9 Wheat.) 1 (1824)....................................................................................... 13

*In re Inquiry Concerning High-Speed Access to the Internet Over Cable,*
17 F.C.C.R. 4798 (2002)................................................................................. 10, 11, 15

*Kapsimallis v. Allstate Insurance Co.,*
104 Cal. App. 4th 667 (2002) .................................................................................... 24

*Kunert v. Mission Finance Services Corp.,*
110 Cal. App. 4th 242 (2003) .................................................................................... 18

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001) ..................................................................................... 24

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS              CASE NO. C-07-06350 PJH

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ........................................................................ 21

*Lloyd v. United States*,
    No. 03-813, 2005 U.S. Dist. LEXIS 18158 (D.N.J. 2005) .............................. 20

*Lockheed Martin Corp. v. Speed*,
    No. 05-1580, 2006 U.S. Dist. LEXIS 53108 (M.D. Fla. 2006)................. 19, 20

*Lozano  v. AT&T Wireless Services*,
    504 F.3d 718 (9th Cir. 2007) ....................................................... 16-17

*Lutheran Church-Missouri Synod v. FCC*,
    154 F.3d 487 (D.C. Cir. 1998).......................................................... 18

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)......................................................................... 16

*Metropolitan Publishing Ltd. v. San Jose Mercury News*,
    861 F. Supp. 870 (N.D.  Cal. 1994)................................................. 18

*Metrophones Telecommunications Inc. v. Global Crossing
    Telecommunications Inc.*,
    423 F.3d 1056 (9th Cir. 2005) ....................................................... 11

*Morris v. BMW of N. America, LLC*,
    No. 07-2827, 2007 U.S. Dist. LEXIS 85513 (N.D. Cal. Nov. 7, 2007) ........... 17

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ....................................................... 15-16

*Phone-Telegraph Commc'ns, Inc. v. AT&T Corp.*,
    100 F. Supp. 2d 313 (E.D. Pa. 2000)................................................. 10

*Plotkin v. Sajahtera, Inc.*,
    106 Cal. App. 4th 953 (2003) ......................................................... 21

*Resdev, LLC v. Lot Builders Association*,
    No. 04-1374, 2005 U.S. Dist. LEXIS 19099 (M.D. Fla. 2005)................. 19, 20

*Rohan ex rel. Gates v. Woodford*,
    334 F.3d 803 (9th Cir. 2003) ......................................................... 12

*Rowe v. New Hampshire Motor Transport Association*,
    128 S. Ct. 989 (2008)...................................................................... 13

*Second Image, Inc. v. Ronsin Photocopy, Inc.*,
    No. 07-5424, 2007 U.S. Dist. LEXIS 95417 (N.D. Cal. 2007)...................... 20

*Shamrock Foods Co. v. Gast*,
    No. 08-0219, 2008 WL 450556 (D. Ariz. Feb. 20, 2008) ............................ 21

*Shvarts v. Budget Group, Inc.*,
    81 Cal. App. 4th 1153 (2000) ......................................................... 21

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS          CASE NO. C-07-06350 PJH

*Southwestern Bell Telegraph Co. v. FCC*,
   153 F.3d 523 (8th Cir. 1998) ................................................................... 14

*Summit Technology, Inc. v. High-Line Medical Instruments, Co.*,
   933 F. Supp. 918 (C.D. Cal. 1996) ......................................................... 22

*Third Story Music, Inc. v. Waits*,
   41 Cal. App. 4th 798 (1995) .................................................................... 25

*United States v. General Dynamics Corp.*,
   828 F.2d 1356 (9th Cir. 1987) ................................................................ 10

*In re Vonage Holdings Corp.*,
   19 F.C.C.R. 22404 (2004) ........................................................... 14, 15, 16

*Vonage Holdings Corp. v. MPUC*,
   290 F. Supp. 2d 993 (D. Minn. 2003) ..................................................... 14

*Walker v. Countrywide Home Loans, Inc.*,
   98 Cal. App. 4th 1158 (2002) .................................................................. 18

*Werner-Matsuda*,
   390 F. Supp. 2d 479 (D. Md. 2005) ........................................................ 21

*Wilderness Society v. Norton*,
   434 F.3d 584 (D.C. Cir. 2006) ................................................................ 18

*Wilens v. TD Waterhouse Group, Inc.*,
   120 Cal. App. 4th 746 (2003) .................................................................. 22

*Williams v. Gerber Products Co.*,
   439 F. Supp. 2d 1112 (S.D. Cal. 2006) ................................................... 22

*Worldspan L.P. v. Orbitz, LLC*,
   No. 05-5386, 2006 U.S. Dist. LEXIS 26153 (D. Ill. 2006) ..................... 19

*Yerkovich v. MCA, Inc.*,
   No. 98-55660, 2000 U.S. App. LEXIS 3259 (9th Cir. 2000) ................... 25

**STATUTES & CODES**

U.S. Const. art. VI, cl. 2 ................................................................................. 13

18 U.S.C. § 1030 ............................................................................... 18, 19, 20

47 U.S.C. § 230 .............................................................................................. 13

47 U.S.C. § 157 note ...................................................................................... 14

Cal. Bus. & Prof. Code § 17200 .................................................................... 16

Cal. Bus. & Prof. Code § 17204 .................................................................... 22

Cal. Bus. & Prof. Code § 17500 .................................................................... 16

Cal. Civ. Code § 1770 (CLRA) ........................................................................ 16, 22

**OTHER AUTHORITIES**

Internet Freedom Preservation Act, H.R. 5353, 110th Cong. (2nd Sess.) ............. 12

S. Rep. No. 101-544, at 5-6 (1990) ........................................................................ 21

S. Rep. No. 104-357, at 4-5 (1996) ........................................................................ 21

136 Cong. Rec. S4568-01, 4614 (Apr. 1990); ....................................................... 21

139 Cong. Rec. S16421-03 (Nov. 19, 1993) .......................................................... 21

Pete Abel, *Fair vs. Foul in Net Neutrality Debate*, themoderatevoice.com
(Nov. 24, 2007), available at http://themoderatevoice.com/media/
internet/16239/fair-vs-foul-in-net-neutrality-debate. ...................................... 6

Associated Press, *House Committee Launches Probe of FCC Management*,
Wall Street Journal, at B9 (Jan. 8, 2008), available at http://online.wsj.
com/article/SB119982972316175627.html?mod=googlenews_wsj. ............... 12

Richard Bennett, *Harold and Kumar Go to Comcastle* (Nov. 6, 2007),
available at
http://www.theregister.co.uk/2007/11/06/richard_bennett_comcastle............... 6

Richard Bennett, The Register, *Dismantling a Religion: The EFF's Faith-
Based Internet* (Dec. 13, 2007), available at http://www.theregister.co.
uk/2007/12/13/bennett_eff_neutrality_analysis ..............................................7

David Downs, *BitTorrent, Comcast, EFF Antipathetic to FCC Regulation
of P2P Traffic*, S.F. Weekly (Jan. 23, 2008), available at
http://news.sfweekly.com/2008-01-23/news/bittorrent-comcast-eff-
antipathetic-to-fcc-regulation-of-p2p-traffic ...................................................4

DCIA, *Comment On Petition For Rulemaking*, No. 07-52, at 9 (Feb. 13,
2008), available at http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?
native_or_pdf=pdf&id_document=6519841058 ...................................... 5, 7, 22

Leslie Ellis, *BitTorrent's Swarms Have a Deadly Bite on Broadband Nets*,
Multichannel News (May 8, 2006), available at
http://www.multichannel.com/article/CA6332098.html ................................... 4

Ernesto, *How to Encrypt BitTorrent Traffic*, TorrentFreak.com, available at
http://torrentfreak.com/how-to-encrypt-bittorrent-traffic ................................ 22

*FCC Public Notice, Comment Sought on Petition for Declaratory Ruling
Regarding Internet Management Policies*, WC Docket No. 07-52
(2008); available at http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?
native_or_pdf=pdf&id_document=6519837887 ........................................... 12

*FCC Public Notice, Comment Sought on Petition for Rulemaking to
Establish Rules Governing Network Management Practices by
Broadband Network Operators*, WC Docket No. 07-52 (2008);
available at http://hraunfoss.fcc.gov /edocs_public/attachmatch/DA-08-

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

92A1.pdf. .................................................................................................... 12

*In re Free Press, et al., Declaratory Ruling that Degrading an Internet Application Violates the FCC's Internet Policy Statement and Does Not Meet an Exception for "Reasonable Network Management,"* WC Docket No. 07-52 (Nov. 1, 2007), available at http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6519825121. ................. 1-2, 11

Gordon Haff, CNet Blogs, *Whatever else it is, P2P is inefficient* (Nov. 20, 2007), available at http://www.cnet.com/8301-13556_1-9821330-61.html ...... 4

Harvard Medical School, Information Technology Department, *HMS IT Peer To Peer (P2P) Policy*, available at http://it.med.harvard.edu/pg.asp?pn=security_p2p ............................................................................ 5

Ipoque, *Internet Study 2007* (2007), available at http://www.ipoque.com/media/internet_studies/internet_study_2007 .............. 4

Rich Karpinski, Telephony Online, *BitTorrent developers seek traffic-shaping route-around* (Feb. 19, 2008) available at http://telephony online.com/broadband/news/bittorrent-traffic-shaping-0219 .......................... 22

James Martin & James Westall, *Assessing the Impact of BitTorrent on DOCSIS Networks*, at 1-2 (Sep. 2007), available at http://people.clemson.edu/~jmarty/papers/bittorrentBroadnets.pdf .................. 4

George Ou, *A Rational Debate on Comcast Traffic Management*, Real World IT, ZDNet Blogs (Nov. 6, 2007), available at http://blogs.zdnet.com/ou/?p=852&page=3 .............................................................. 7

George Ou, *EFF Wants to Saddle You with Metered Internet Service*, Real World IT, ZDNet Blogs (Dec. 3, 2007), available at http://blogs.zdnet.com/ou/?p=914&page=3 ................................................................. 7

Avis Rivers, *Network Neutrality:  Hysteria Makes for Bad Law*, Seattle Times (Dec. 20, 2007), available at http://seattletimes.nwsource.com/html/opinion/2004083048_broadband20.html ................................................ 4

Peter Svensson, Associated Press, *Comcast Blocks Some Internet Traffic* (Oct. 19, 2007), available at http://www.msnbc.msn.com/id/21376597 ............ 4

Peter Svensson, Associated Press, *How The AP Tested Comcast's File-Sharing Filter* (Oct. 19, 2007), available at http://abcnews.go.com/Technology/wireStory?id=3750910 ................................................ 7

*In re Vuze, Inc., Petition to Establish Rules Governing Network Management Practices by Broadband Network Operators*, WC Docket No. 07-52 (Nov. 14, 2007), available at http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6519811711 ............................. 1, 11-12

Christopher S. Yoo, *Network Neutrality and the Economics of Congestion,* 94 Geo. L.J. 1847, 1852, 1862, 1875, 1879 (Aug. 2006) .......................... 3, 4, 5

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS                    CASE NO. C-07-06350 PJH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  **INTRODUCTION**

This case presents a sweeping state law challenge to Comcast's management of congestive peer-to-peer ("P2P") file sharing protocols on its broadband Internet network. As explained below, the Court should issue a stay or enter judgment against Mr. Hart, as his claims are within the primary jurisdiction of the FCC, are preempted by federal law, and fail to state a claim under the laws of California (or any other state for that matter).

Mr. Hart posits that Comcast's management of P2P file sharing traffic violates California law because it is "unfair" and because any network management that may have the effect of slowing a particular activity renders "fraudulent" Comcast's advertisement of "high speed" service.  Of course, if Comcast were required to permit P2P traffic to occupy its network unchecked by any form of management, as Mr. Hart here demands, then it would surely breach any alleged "promise" of "high speed" service for the vast majority of its subscribers.  Indeed, "speed" would be the least of anyone's worries in the world that Mr. Hart envisions, as basic activities such as Web browsing and video streaming would be routinely degraded at any speed.  In recognition of that fact, the FCC has declared that "reasonable network management" is integral to the provision of broadband Internet service.  *See In re Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 F.C.C.R. 14986, 14988 n.15 (2005) (hereinafter the "Internet Policy Statement").

It is no exaggeration to say that these issues are at the top of the FCC's agenda. The FCC has several open dockets that bear on these issues; is accepting public comment and hearing public testimony from various interested parties, including Comcast and purported consumer advocates; has been asked to declare that Comcast's network management is illegal; has been asked to enact formal rules for network management and disclosures; and has been asked to impose civil forfeitures on Comcast.  *See In re Vuze, Inc., Petition to Establish Rules Governing Network Management Practices by Broadband Network Operators*, WC Docket No. 07-52 (Nov. 14, 2007); *In re Free Press,*

1    *et al., Declaratory Ruling that Degrading an Internet Application Violates the FCC's*
2    *Internet Policy Statement and Does Not Meet an Exception for "Reasonable Network*
3    *Management,"* WC Docket No. 07-52 (Nov. 1, 2007).  Because these issues are within
4    the subject matter jurisdiction of the FCC, and because the FCC is actively investigating
5    them, this Court should stay its hand under the primary jurisdiction doctrine.  To be clear,
6    Comcast believes that regulation of network management by Internet Service Providers
7    ("ISPs") is unnecessary and unwarranted, as the marketplace always has resolved and
8    always will resolve such issues on its own.  But the fact remains that the FCC is
9    reviewing the very allegations that fuel this lawsuit.  This Court should stay this action
10   and allow the FCC to provide guidance in this important area before moving forward.

11           If the Court does not stay its hand, it should enter judgment against Mr. Hart.  As a
12   matter of federal law, the reasonableness of an ISP's network management cannot be
13   determined by reference to any state's laws, let alone the disparate laws of fifty states.
14   Congress has declared that the Internet should be "unfettered" by regulation, and nothing
15   could conflict more with that policy than allowing each of the fifty states to establish its
16   own framework for how ISPs may manage their networks.  Indeed, a fifty-state morass of
17   varying network management rules would make it virtually impossible for ISPs to
18   operate their interstate networks with any consistency.  And as a matter of state law,
19   Comcast's conduct is not unfair, unlawful or "fraudulent."  To the contrary, its conduct is
20   absolutely necessary, abundantly reasonable and adequately disclosed; its advertisements
21   were run-of-the-mill puffery that were neither untrue nor misleading; and its conduct did
22   not breach any contractual or quasi-contractual duty it may have owed Mr. Hart.

23           Taken to their logical extreme, Mr. Hart's claims would prevent Comcast from
24   filtering spam email (500 million of which its network filters each day), from intercepting
25   viruses and other "malware," from addressing cyber-bullying, and from blocking child
26   pornography – none of which would be good for anyone, including Mr. Hart.  If this
27   Court is inclined to move forward and adjudicate these claims without the benefit of the
28   FCC's resolution of the matters now before it, then these claims should all be rejected.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS            CASE NO. C-07-06350 PJH

## II.   BACKGROUND

### A.   Comcast's P2P Management Is Necessary

On a global level, the Internet deals with bandwidth congestion quite well. Information that is transmitted over the Internet is broken down into various "packets," each of which is separately forwarded from one packet switch (or "node") to another. Unlike traditional circuit-switched networks, packet-switched networks do not require a single, dedicated physical circuit from one end to the other for the duration of the communication session.  Instead, packets of data are delivered over multiple physical paths, each of which may be automatically redirected in order to avoid congested areas, and reassembled for use when they reach their final destination.  On a local level, however, bandwidth congestion is not so easily avoided.  In that "last mile," there is no multiplicity of nodes, and thus no way for packets to be rerouted around congested areas. This is especially true with "shared" networks, such as those used by cable and wireless providers.  In short, if there is congestion, packets wait in line (and may even be lost) until it abates.  As a result, one subscriber's use can significantly affect another's.  *See, e.g.*, Christopher S. Yoo, *Network Neutrality and the Economics of Congestion*, 94 Geo. L.J. 1847, 1852, 1862, 1875, 1879 (Aug. 2006).

Never has this phenomenon been more apparent than with P2P technology.  P2P is a form of distributed computing that has become popular of late because it reduces the burden on content providers.  A content provider that in the past had to transmit a complete copy of a file to every customer who requested it (and purchase many servers and much associated bandwidth in order to do so) can now publish a file once and rely on its customers to do the rest of the work.  Take, for example, the BitTorrent protocol. BitTorrent allows a content provider to act as an "initial seeder" of a .torrent file.  The initial person to download that file downloads it from the initial seeder, but as more peers download it, there will be more sources (or "seeders") from which to download it. Subsequent downloaders can then download small "pieces" of the file from a "swarm" of perhaps hundreds or thousands of seeders who already have copies of it.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

3

Although P2P reduces the burden on content distributors, it significantly increases the burden on networks, as the protocol is inherently inefficient. *See* James Martin & James Westall, *Assessing the Impact of BitTorrent on DOCSIS Networks*, at 1-2 (Sep. 2007), available at http://people.clemson.edu/~jmarty/papers/bittorrentBroadnets.pdf; *see also* Gordon Haff, CNet Blogs, *Whatever else it is, P2P is inefficient* (Nov. 20, 2007), available at http://www.cnet.com/8301-13556_1-9821330-61.html. Decentralized file-sharing has certain benefits to be sure, but efficiency is not one of them. Nor was it meant to be. Bram Cohen, the creator of the BitTorrent protocol, was recently quoted as follows: "My whole idea was, 'Let's use up a lot of bandwidth,' . . . I had a friend who said, 'Well, ISPs won't like that.' And I said, 'Why should I care?'" David Downs, *BitTorrent, Comcast, EFF Antipathetic to FCC Regulation of P2P Traffic*, S.F. Weekly (Jan. 23, 2008), available at http://news.sfweekly.com/2008-01-23/news/bittorrent-comcast-eff-antipathetic-to-fcc-regulation-of-p2p-traffic. That inefficiency takes its toll on broadband networks. Indeed, P2P accounts for 50 to 95% of all broadband traffic,[1] and studies have demonstrated that as few as *fifteen* BitTorrent users can congest the network associated with a node, significantly affecting Internet telephony (VoIP), online gaming, and other common Internet applications. *See* Martin & Westall at 6; *see also* Leslie Ellis, *BitTorrent's Swarms Have a Deadly Bite on Broadband Nets*, Multichannel News (May 8, 2006), available at http://www.multichannel.com/article/CA6332098.html.

Although Comcast invests hundreds of millions of dollars every year to improve the speed and scope of its network,[2] its bandwidth, like any ISP's bandwidth, is finite. Broadband providers are thus faced with a choice: either allow P2P protocols to degrade

---

[1] *See* Downs, *supra*; Yoo, *supra*, at 1879 n.145; Peter Svensson, Associated Press, *Comcast Blocks Some Internet Traffic* (Oct. 19, 2007), available at http://www.msnbc.msn.com/id/21376597; Ipoque, *Internet Study 2007* (2007), available at http://www.ipoque.com/media/internet_studies/internet_study_2007; Avis Rivers, *Network Neutrality: Hysteria Makes for Bad Law*, Seattle Times (Dec. 20, 2007), available at http://seattletimes.nwsource.com/html/opinion/2004083048_broadband20.html.

[2] For example, Comcast is working toward deploying later this year a DOCSIS 3.0 technology that will significantly increase bandwidth, allowing subscribers to download a high-definition movie in less than four minutes. *See* Fact Sheet, *Comcast's Network: America's Leading Network* (Jan. 9, 2008), available at http://www.comcast.com/ces/content/images/Wideband/WidebandNetworkFS.pdf.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS                    CASE NO. C-07-06350 PJH

1    the experience of all subscribers or use tools that manage P2P protocols as infrequently

2    and innocuously as possible.[3]  Consistent with the FCC's pronouncements in this area,

3    Comcast has chosen the latter.  *See  In re Appropriate Framework for Broadband Access*

4    *to the Internet over Wireline Facilities*, 20 F.C.C.R. 14986, 14988 n.15 (2005) ("The

5    principles we adopt are subject to reasonable network management.").  Indeed, even the

6    Distributed Computing Industry Association, whose members develop P2P protocols,

7    concedes that its members "should bear some meaningful responsibility for consuming

8    disproportionate amounts of network resources" and ISPs "should be permitted to take

9    into account and manage their networks to address any such impact."  DCIA, *Comment*

10    *On Petition For Rulemaking*, No. 07-52, at 9 (Feb. 13, 2008), available at http://fjallfoss.

11    fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6519841058.

12        Network management, it should also be noted, does more than enable ISPs to

13    address congestion in the short term.  Opponents of network management posit a world in

14    which ISPs waive a magic wand and have infinite bandwidth, making management

15    unnecessary.  But that isn't possible today and it never will be.  *See generally* Yoo, *supra*.

16    Increasing bandwidth capacity is an extremely expensive and labor-intensive endeavor.

17    Allowing ISPs to manage their networks in order to address occasional congestion allows

18    them to defer some of those costs and, in turn, avoid raising subscriber fees and allocate

19    funds toward expanding and upgrading networks.  In short, network management allows

20    ISPs to offer service to those who otherwise could not receive or pay for it, especially

21    low- and fixed-income subscribers and rural subscribers.  *Id.* at 1853-55, 1885, 1908.

22 **B.**      **Comcast's P2P Management Is Reasonable**

23        Managing a network is a dynamic exercise, changing – often in real time – as new

24    technologies emerge and subscriber habits evolve.  That said, Comcast's current P2P

25    management measures can be summarized as follows: if P2P protocols that have a history

26

27      [3]      A third option would be to prohibit and block P2P outright.  Comcast does not, but notes that some academic institutions do.  *See, e.g.*, Harvard Medical School, Information Technology Department, *HMS IT Peer To Peer (P2P) Policy*, available at http://it.med.harvard.edu/pg.asp?pn=security_p2p.

28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

of congesting Comcast's network reach a preset level in a neighborhood, Comcast begins issuing instructions called "reset packets"[4] in order to temporarily limit the number of new unidirectional uploads (*i.e.*, uploads that occur when the subscriber is not also downloading) those P2P protocols can initiate in that neighborhood until the congestion in the neighborhood drops below the predetermined level. Comcast does *not* manage downloads, does *not* manage bidirectional uploads (*i.e.*, uploads that occur when the subscriber is also downloading), does *not* manage uploads that are already underway, and does *not* "block" even the P2P uploads that it does temporarily manage.[5]

This practice is entirely reasonable. First, because computers commonly receive reset packets when network problems occur, applications and services know to automatically try to reestablish the P2P connection without the subscriber's having to manually intervene. That is especially useful for P2P users, who often set up their computers to seed files while they are unattended. *See* Pete Abel, *Fair vs. Foul in Net Neutrality Debate*, themoderatevoice.com (Nov. 24, 2007), available at http://the moderatevoice.com/media/internet/16239/fair-vs-foul-in-net-neutrality-debate. Indeed, this network management practice is designed only to affect unidirectional uploads, which is to say only computers that are uploading but not downloading at the same time – a telltale sign of an unattended computer.

Second, there is no direct effect on P2P *downloads* by Comcast's subscribers, and little if any indirect effect on downloads by anyone. At most, if new unidirectional uploads have been temporarily foreclosed in a given neighborhood due to localized network congestion, there would be a very brief delay as a downloader's P2P protocol seeks out copies of the file from a different peer. In the typical P2P situation,[6] when a

---

[4]    A "reset" is simply a bit in the packet header that signals that a new connection needs to be established because there are error conditions in the network.

[5]    *See, e.g.*, Richard Bennett, *Harold and Kumar Go to Comcastle* (Nov. 6, 2007), available at http://www.theregister.co.uk/2007/11/06/richard_bennett_comcastle ("BitTorrent isn't disabled on the Comcast network. I'm a Comcast customer, and as I write this I'm seeding several video files. . . .").

[6]    Much of the hullabaloo over P2P management began as a result of an Associated Press test in which the P2P swarming functionality was bypassed by searching for a unique file from a unique seeder.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS                    CASE NO. C-07-06350 PJH

1    download begins, the P2P protocol searches for multiple seeders that have the same file.

2    Thus, even if one seeder's uploading is delayed, the protocol is already searching for, and

3    in the vast majority of cases has already found, other seeders from which to download.

4    Moreover, the network will allow the computer to begin uploading once congestion has

5    abated, which could be anywhere from a few milliseconds to a few minutes.  In light of

6    the fact that P2P protocols are often used for files that may take hours to transmit, any

7    such delay would be negligible.  And in light of the delays other subscribers would

8    experience were P2P not managed, it would be more than fair.

9         Third, although there are various ways to address congestion generally, there are

10   few practical ways to address the congestion caused by P2P.  *See* George Ou, *EFF Wants

11   to Saddle You with Metered Internet Service*, Real World IT, ZDNet Blogs (Dec. 3,

12   2007), available at http://blogs.zdnet.com/ou/?p=914&page=3 ("Since BitTorrent has no

13   such congestion control mechanism . . ., the only machine language it understands" is

14   reset packets, a technique that "is common in the networking and software industry where

15   alternatives don't exist."); George Ou, *A Rational Debate on Comcast Traffic

16   Management*, Real World IT, ZDNet Blogs (Nov. 6, 2007), available at http://blogs.

17   zdnet.com/ou/?p=852&page=3; Richard Bennett, The Register, *Dismantling a Religion:

18   The EFF's Faith-Based Internet* (Dec. 13, 2007), available at http://www.theregister.co.

19   uk/2007/12/13/bennett_eff_neutrality_analysis ("The Internet's traffic toolkit is nearly

20   barren, so it's no wonder that Comcast and its peers would use" reset packets "to

21   accomplish an end that all rationale people agree is worthwhile."); DCIA, *Comment on

22   Petition for Rulemaking*, *supra*, at 5.  Accordingly, many ISPS use management tools that

23   are similar to, if not substantially the same as, the ones currently used by Comcast.  *See,

24   e.g.*, http://www.azureuswiki.com/index.php/Bad_ISPs#United_States_of_America.

25        Finally, Comcast's network management practices are narrowly tailored.  They are

26

27   _____

     *See* Peter Svensson, Associated Press, *How The AP Tested Comcast's File-Sharing Filter* (Oct. 19, 2007),
28   available at http://abcnews.go.com/Technology/wireStory?id=3750910.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS                CASE NO. C-07-06350 PJH

content-agnostic, meaning they do not manage uploads based on content; they were designed (and will continue to be refined) to affect only those P2P protocols that have historically had a congestive effect on Comcast's network; and they are only activated if a predetermined threshold of network activity is reached and are suspended as soon as it abates.  In short, they are minimally intrusive and were designed solely to ensure that the needs of the many are not outweighed by the needs of the few – or the one.

## C.    **Comcast's P2P Management Is Disclosed**

Mr. Hart admits that he subscribed to Comcast's high-speed Internet service in September 2007 and, before doing so, reviewed and agreed to the terms and conditions of the subscriber agreement that was posted on Comcast's website.  Pl.'s Compl. ¶¶ 41-42. He therefore admits that he agreed to comply with the terms of the then-applicable Acceptable Use Policy ("AUP").  Comcast Agreement for Residential Services § 7, available at http://www6.comcast.net/terms/subscriber.  The AUP disclosed that, because Comcast's service was offered via a shared network, subscribers could not use the service in a way that would adversely affect others.    *See* AUP § 7, previously available at http://www6.comcast.net/terms/use ("Prohibited uses include . . . generating levels of traffic sufficient to impede others' ability to send or retrieve information") (Exhibit A to RFJN); *id.*, Network, Bandwidth, Data Storage and Other Limitations ("You shall ensure that your use of the Service does not restrict, inhibit, interfere with, or degrade any other user's use of the Service, nor represent (in the sole judgment of Comcast) an overly large burden on the network. . . .").   The AUP also disclosed that Comcast would take appropriate action to prevent subscribers from engaging in prohibited uses, including managing individual transmissions when necessary.   *Id.*, Inappropriate Content and Transmissions ("Comcast reserves the right . . . to refuse to transmit or post and to remove or block any information or materials, in whole or in part, that it, in its sole discretion, deems to be offensive, indecent, or otherwise inappropriate. . . ."); *id.*, Violation of Acceptable Use Policy ("Comcast and its suppliers reserve the right at any time to monitor bandwidth. . . .  [I]f the Service is used in a way that Comcast or its

Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

8

suppliers . . . believe violate this AUP, Comcast or its suppliers may take any responsive actions they deem appropriate.  These actions include . . . the immediate suspension or termination of all or any portion of the Service.").

Mr. Hart's subscriber agreement also disclosed that Comcast's service would not be free of delays and was therefore not appropriate for uses that require delay-free performance.  *See* Comcast Agreement for Residential Services, ¶ 10 ("NEITHER COMCAST NOR ITS AFFILIATES . . . WARRANT THAT THE COMCAST EQUIPMENT OR THE SERVICES WILL MEET YOUR REQUIREMENTS, PROVIDE UNINTERRUPTED USE, OR OPERATE AS REQUIRED, WITHOUT DELAY. . . .") (typography in original); *id.* § 11(e).  It also disclosed that Comcast could manage its network by monitoring it for objectionable transmissions and managing such transmissions when it became necessary to do so:

> [Y]ou acknowledge and agree that Comcast and its agents have the right to monitor, from time to time, any such postings and transmissions. . . .  We reserve the right to refuse to upload, post, publish, transmit or store any information or materials, in whole or in part, that, in our sole discretion, is unacceptable, undesirable or in violation of this agreement.

*Id.* § 3(b).

Comcast is constantly in the process of updating its AUP and FAQs in order to reflect its present practices and respond to its customers' questions.  To that end, a recent revision to the AUP describes Comcast's P2P network management in even more detail:

> Comcast uses various tools and techniques to manage its network. . . . These tools and techniques are dynamic, like the network and its usage, and can and do change frequently.  For example, these network management activities may include . . . temporarily delaying peer-to-peer sessions (or sessions using other applications or protocols) that users of the Service may wish to establish during periods of high network congestion [and] limiting the number of peer-to-peer sessions users of the Service may establish. . . .

AUP, *available at* http://www6.comcast.net/terms/use.  Comcast's FAQs were recently revised as well: "Comcast may on a limited basis temporarily delay certain P2P traffic when that traffic has, or is projected to have, an adverse effect on other customers' use of the service. . . ."  Frequently Asked Questions About Network Management, *available at* http://www.comcast.net/help/faq/index.jsp?faq=SecurityNetwork_Management19163.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

# III.   DISCUSSION

## A.    Plaintiff's Claims Are Within The FCC's Primary Jurisdiction

The primary jurisdiction doctrine promotes "uniformity in administration" of regulatory law by "ensuring that administrative bodies possessed of both expertise and authority delegated by Congress pass on issues within their regulatory authority before consideration by the courts."  *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362, 1365 (9th Cir. 1987).  Pursuant to this doctrine, a court is  "obliged to defer" to an agency where the "issue brought before a court is in the process of litigation through procedures originating in the [agency]."  *Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621, 647 (1972).  As the Ninth Circuit has said, "an issue either is within an agency's primary jurisdiction or it is not, and, if it is, a court may not act until the agency has made the initial determination."  *Gen. Dynamics*, 828 F.2d at 1364 n.15; *see also Phone-Tel Commc'ns, Inc. v. AT&T Corp.*, 100 F. Supp. 2d 313, 321 (E.D. Pa. 2000).

*GTE.net LLC v. Cox Commc'ns, Inc.*, 185 F. Supp. 2d 1141, 1147 (S.D. Cal. 2002) is instructive.  In *GTE.net*, the parties disputed whether cable Internet qualified as a "telecommunications service" under the Telecommunications Act.  After acknowledging the "widespread and frustrating disagreement over the proper classification of cable Internet service" that had prompted the FCC to examine the issue, the court decided to stay the proceedings: "The regulation of cable Internet involves complex issues with far-reaching consequences.  The issue is clearly not being taken lightly by the experts at the FCC, and this Court defers to that concern and pending investigation."  *Id.* at 1445.

Any inquiry into whether Comcast's P2P management is unlawful falls squarely within the FCC's subject matter jurisdiction.  *See id.*; *In re Inquiry Concerning High-Speed Access to the Internet Over Cable*, 17 F.C.C.R. 4798, ¶ 77 (2002), *aff'd National Cable Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 976, 980, 996 (2005); *In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14853, ¶ 109 (2005); *In re Broadband Industry Practice*s, NOI, 22 F.C.C.R. 7894, ¶ 4 (2007); *see also AT&T Corp. v. City of Portland*, 216 F.3d 871,

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

10

879-80 (9th Cir. 2000); *Metrophones Telecomms. Inc. v. Global Crossing Telecomms. Inc.*, 423 F.3d 1056, 1070 (9th Cir. 2005).  In fact, the FCC has multiple dockets open that seek public comment on whether it should adopt rules implementing its Internet Policy Statement, and it is actively investigating whether ISPs in general, and Comcast in particular, may use the sort of network management tools that are at issue here:

- **March 22, 2007.**  The FCC issues a Notice of Inquiry asking "whether network platform providers and others favor or disfavor particular content, how consumers are affected by these policies, and whether consumer choice of broadband providers is sufficient to ensure that all such policies ultimately benefit consumers. . . ." *In re Broadband Industry Practices*, NOI, 22 F.C.C.R. 7894, ¶ 1 (2007).[7]

- **November 1, 2007.**  Free Press files a Petition alleging that Comcast is degrading P2P traffic in violation of the FCC's Internet Policy Statement.  *In re Free Press, et al., Declaratory Ruling that Degrading an Internet Application Violates the FCC's Internet Policy Statement and Does Not Meet an Exception for "Reasonable Network Management,"* WC Docket No. 07-52 (2007), available at http://fjallfoss.fcc. gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6519825121.  It asks the FCC to enjoin Comcast from managing P2P traffic, to impose fines for every subscriber affected, including Mr. Hart, and to declare Comcast's business practices deceptive.

- **November 14, 2007.**  Vuze files a Petition asking the FCC "to examine the network operators' network management practices and to adopt reasonable rules that would prevent the network operators from engaging in practices that discriminate against particular Internet applications, content or technologies."  *In re Vuze, Inc., Petition to Establish Rules Governing Network Management Practices by Broadband Network Operators*, WC Docket No. 07-52, at ii (2007), available at http://fjallfoss.fcc.gov/

---

[7]    *See also In re Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, Report & Order & NPRM, 20 F.C.C.R. 14853, 14929-35, ¶¶ 146-59 (2005); *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities*, Declaratory Ruling and NPRM, 17 F.C.C.R. 4798, 4839-54 ¶¶ 72-111 (2002).

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

11

1   prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6519811711.

2   • **January 8, 2008.** FCC Chairman Kevin Martin announces that the FCC

3   will "investigate complaints that Comcast Corp. actively interferes with Internet traffic as

4   its subscribers try to share files online." Associated Press, *House Committee Launches*

5   *Probe of FCC Management*, Wall Street Journal, at B9 (Jan. 8, 2008), available at

6   http://online.wsj.com/article/SB119982972316175627.html?mod=googlenews_wsj.

7   • **January 14, 2008.** The FCC issues two Public Notices that seek comment

8   on the Vuze and Free Press Petitions. *FCC Public Notice, Comment Sought on Petition*

9   *for Declaratory Ruling Regarding Internet Management Policies*, WC Docket No. 07-52

10  (2008); available at http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_

11  document=6519837887; *FCC Public Notice, Comment Sought on Petition for*

12  *Rulemaking to Establish Rules Governing Network Management Practices by Broadband*

13  *Network Operators*, WC Docket No. 07-52 (2008); available at http://hraunfoss.fcc.gov

14  /edocs_public/attachmatch/DA-08-92A1.pdf.

15  • **February 13, 2008.** Representative Markey introduces legislation that

16  would require the FCC to complete an investigation and report to Congress within one

17  year. *See* Internet Freedom Preservation Act, H.R. 5353, 110th Cong. (2nd Sess.).

18  • **February 25, 2008.** The FCC holds public hearings on P2P management,

19  during which Comcast and others offer statements and other evidence concerning the

20  necessity and reasonableness of its network management practices and disclosures.

21  Because the FCC is actively reviewing the conduct that Mr. Hart complains about,

22  and because that conduct falls squarely within the FCC's subject matter jurisdiction, this

23  Court should stay this action and allow the FCC to make an initial determination

24  regarding the reasonableness of P2P management. Doing so would preserve resources,

25  promote comity, and prevent potentially conflicting judgments.[8]

26

27  [8]    Of course, the Court also has the inherent authority to stay this action if the primary jurisdiction
    doctrine is found to be inapplicable. *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003).

28

Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

1

**B.**    **Mr. Hart's Claims Are Preempted By Federal Law**

2

In the event the Court does not stay this action in deference to the FCC, the

3 Plaintiff's claims should all be dismissed because they are preempted by federal law.

4 The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2,

5 preempts state laws that "interfere with or are contrary to, the laws of Congress . . . ."

6 *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824). In determining whether there is

7 federal preemption, Congress's intent is the "ultimate touchstone of [the] analysis."

8 *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992). The intent to preempt may be

9 implied from the scope or effect of federal law, but may be expressly stated as well.

10

The Supreme Court's recent decision in *Rowe v. New Hampshire Motor Transp.*

11 *Ass'n*, 128 S.Ct. 989 (2008) is instructive. In *Rowe*, the State of Maine passed laws that

12 were meant to prevent the transportation of tobacco products to minors. Transport

13 carriers associations sought to have the state laws stricken as preempted by a federal

14 statute that deregulated the trucking industry and preempted state laws that conflicted

15 with that federal deregulatory policy. The District Court, the Circuit Court, and the

16 Supreme Court all agreed that the state laws, though well meaning, were preempted:

17
18
19
20
21
22

> The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for "competitive market forces" in determining (to a significant degree) the services that motor carriers will provide. . . To allow Maine to insist that the carriers provide a special checking system would allow other States to do the same. And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations. That state regulatory patchwork is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace.

23

*Id.* at 995-96.

24

Here, Congress has expressed its intent to preempt state regulation of the Internet,

25 declaring that "the policy of the United States" is "to promote the continued development

26 of the Internet" and "to preserve the vibrant and competitive free market that presently

27 exists for the Internet" by ensuring that it remains "unfettered by Federal or State

28 regulation." 47 U.S.C. § 230(b); *id.* § 230(e)(3) ("No cause of action may be brought and

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

1    no liability may be imposed under any State or local law that is inconsistent with this

2    section."); *see also* Telecommunications Act of 1996, P.L. 104-104, Title VII, § 706, 110

3    Stat. 153 (codified at 47 U.S.C. § 157 note) ("the deployment on a reasonable and timely

4    basis of advanced telecommunications capability to all Americans" should be encouraged

5    through "regulatory forbearance").  By any measure, that policy has been a resounding

6    success.  When the Internet first emerged, it was accessible to only a handful of people.

7    It is now available and affordable to hundreds of millions of people, from all parts of the

8    country and all walks of life.  In short, it has become a ubiquitous part of every day life.

9        Federal courts have given effect to § 230(b)(2).  For example, in *Southwestern*

10   *Bell Telephone Co. v. FCC*, 153 F.3d 523 (8th Cir. 1998), landline telephone companies

11   appealed an FCC order which, among other things, exempted ISPs from paying the

12   interstate access charges that they as common carriers were required to pay.  The FCC

13   relied on § 230(b)(2) in concluding that ISPs should be unfettered from such state

14   regulation, and the United States Court of Appeals for the Eighth Circuit affirmed its

15   reliance on § 230(b)(2).  *Id.* at 544.  Similarly, in *Vonage Holdings Corp. v. MPUC*, 290

16   F. Supp. 2d 993 (D. Minn. 2003), the State of Minnesota tried to regulate Vonage's

17   Internet telephone (VoIP) service as if Vonage were a traditional landline telephone

18   carrier.  The FCC again concluded that state regulation was preempted.  In an opinion

19   that was later affirmed by the Eighth Circuit, the United States District Court for the

20   District of Minnesota cited § 230(b)(2) in support of its affirmance of the FCC's ruling.

21   *Id.* at 997 ("Congress has spoken with unmistakable clarity on the issue. . . .").

22       For its part, the FCC has frequently cited § 230(b)(2) and the national policy of

23   regulatory forbearance where the Internet is involved.  *See, e.g.*, *In re Vonage Holdings*

24   *Corp.*, 19 F.C.C.R. 22404, ¶¶ 22-24, 34-37 (2004); *In re Amendment of Parts 1, 21, 73,*

25   *74 and 101 of the Commission's Rules to Facilitate the Provision of Fixed and Mobile*

26   *Broadband Access, Educ. and Other Advanced Servs. in the 2150-2162 and 2500-2690*

27   *MHz Bands*, 18 F.C.C.R. 6722, ¶ 34 (2003) ("Broadband services should exist in an

28   environment that eliminates regulations that deter investment and innovation. . . .");

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

14

*Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities, Universal Service Obligations of Broadband Providers*, 17 F.C.C.R. 3019, ¶ 5 (2002) ("broadband services should exist in a minimal regulatory environment that promotes investment and innovation. . . ."); *In re Inquiry Concerning High-Speed Access to the Internet Over Cable*, 17 F.C.C.R. 4798, ¶ 73 (2002) ("we are mindful of the need to minimize both regulation of broadband services and regulatory uncertainty. . . .").

The need to maintain a uniform regulatory framework for the Internet is critical. Permitting state law claims such as those asserted in this case to proceed would create a patchwork of fifty different standards regarding the propriety of network management, an untenable result that flies in the face of § 230(b)(2). As the FCC has explained:

> We would be concerned if a patchwork of State and local regulations beyond matters of purely local concern resulted in inconsistent requirements affecting cable modem service, the technical design of the cable modem service facilities, or business arrangements that discouraged cable modem service deployment across political boundaries. We also would be concerned if State and local regulations limited the Commission's ability to achieve its national broadband policy goals. . . .

*Id.* ¶ 97. Those concerns are well founded, for the inevitable morass of conflicting state regulation would make Internet services impractical, if not impossible, to provide. *See In re Vonage Holdings Corp.*, 19 F.C.C.R. 22404, ¶ 30 ("Due to the intrinsic ubiquity of the Internet, nothing short of Vonage ceasing to offer its service entirely" could prevent it from being subjected to regulations imposed by "more than 50 separate jurisdictions."); *id.* ¶ 37 ("Allowing Minnesota's order to stand would invite similar imposition of 50 or more additional sets of different economic regulations on DigitalVoice, which could severely inhibit the development of this and similar VoIP services. We cannot, and will not, risk eliminating or hampering this innovative advanced service. . ."); *id.* ¶ 35 ("[I]n interpreting section 230 . . . we cannot permit more than 50 different jurisdictions to impose traditional common carrier economic regulations . . . and still meet our responsibility to realize Congress's objective.").[9]

---

[9] These concerns have caused courts and the FCC to alternatively invoke the Commerce Clause to strike down legislation regulating the Internet. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239-40 (4th Cir.

1    Regulation through private litigation rather than public legislation raises the same

2    concerns and suffers the same fate. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 504 (1996)

3    (Breyer, J. concurring) ("[The] effects of the state agency regulation and the state tort suit

4    are identical" and to "distinguish between them for pre-emption purposes would" be an

5    "anomalous result."); *see also Cipollone*, 505 U.S. at 521 ("[R]egulation can be as

6    effectively exerted through an award of damages as through some form of preventive

7    relief.  The obligation to pay compensation can be, indeed is designed to be, a potent

8    method of governing conduct and controlling policy."). Here, Mr. Hart's claims are at

9    loggerheads with Congress's sound decision to free the Internet from state regulation.

10    Nothing could more clearly conflict with the objectives of Congress than allowing claims

11    like this to proceed in state court or under state law.  Accordingly, Mr. Hart's claims are

12    preempted by federal law and Comcast is entitled to the entry of judgment in its favor.

13    **C.    Mr. Hart's Claims Fail As A Matter Of State Law**

14    If this Court were to proceed without a stay under the primary jurisdiction

15    doctrine, and assuming for the sake of argument there is no federal preemption, the Court

16    should nonetheless enter judgment against Mr. Hart because he cannot state a claim under

17    the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, the Consumer

18    Legal Remedies Act (CLRA), Cal. Civ. Code § 1770 (CLRA), the False Advertising Law

19    (FAL), Cal. Bus. & Prof. Code § 17500, or any other state law for that matter.  We begin

20    with the claim that P2P management is actionable under § 17200 as "unfair."

21    **1.    Comcast's Conduct Is Not "Unfair"**

22    California courts have been unable to agree on one definition of the term "unfair"

23    as used in the UCL.  Recently, the Ninth Circuit approved two "unfairness" tests. *Lozano*

---

24

25    2004); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1162-63 (10th Cir. 1999) ("[C]ertain types of commerce have been recognized as requiring national regulation.  The Internet is surely such a medium."); *Center for Democracy and Tech. v. Pappert*, 337 F. Supp. 2d 606, 662-63 (E.D. Pa. 2004); *Am. Libraries Assoc. v. Pataki*, 969 F. Supp. 160, 183 (S.D.N.Y 1997) ("[C]ertain types of commerce demand consistent treatment and are therefore susceptible to regulation only on a national level.  The Internet represents one of those areas...");  *In re Vonage Holdings Corp.*, 19 F.C.C.R. 22404, ¶¶ 38-41.

26

27

28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS    CASE NO. C-07-06350 PJH

1  *v. AT&T Wireless Servs.*, 504 F.3d 718, 735-36 (9th Cir. 2007). After *Lozano*, courts

2  may apply a balancing test that weighs the alleged impact on the plaintiff against the

3  justifications of the defendant, or may apply an arguably narrower test that requires that

4  the plaintiff's claim be "tethered" to a declared legislative policy. *Id.*; *Morris v. BMW of*

5  *N. Am., LLC*, No. 07-2827, 2007 U.S. Dist. LEXIS 85513, *21 (N.D. Cal. Nov. 7, 2007).

6      *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (2006) is instructive.

7  In *Bardin*, the plaintiffs claimed that the defendant's use of tubular steel in its exhaust

8  manifolds violated the UCL because the industry standard was to use more durable cast-

9  iron instead. The court rejected their claim, reasoning that any impact on the plaintiffs

10  was theoretical and outweighed by the defendant's business justifications, *id.* at 1270,

11  and in any event the "the right to have a vehicle containing an exhaust manifold that lasts

12  as long as an 'industry standard' cast-iron exhaust manifold is one based on a contract

13  such as a warranty, not on a legislatively declared policy." *Id.* at 1273.

14      As in *Bardin*, the proper test to apply in this case is an interesting but ultimately

15  academic question, as Comcast's conduct cannot be considered "unfair" under either test.

16  First, the FCC has explicitly decided to permit reasonable network management, and it is

17  not for this Court to revisit – let alone reverse – that sound policy decision. *See, e.g.*,

18  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182-83 (1999) ("If

19  the Legislature has permitted certain conduct or considered a situation and concluded no

20  action should lie, courts may not override that determination."); *Chavez v. Whirlpool*

21  *Corp.*, 93 Cal. App. 4th 363, 375 (2001). Second, the "fairness" or "reasonableness" of

22  these practices is not something that should be decided by reference to state law or in this

23  forum, at least not initially. *See supra*. Finally, if the Court is inclined to reach the issue,

24  this practice is more than fair: it has no discernible effect on Comcast subscribers or

25  others; it is content agnostic; it only affects those protocols that have historically had a

26  congestive effect on Comcast's network; and it is only activated when there is congestion

27  and is suspended as soon as congestion abates. It is also absolutely necessary, making it

28  possible to deliver the services that millions of Americans enjoy and rely on every day,

Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

1    such as dialing 911 with VoIP services, viewing Presidential debates, or blogging about

2    current events, just to name a few.  It simply cannot be considered unfair to temporarily

3    place the needs of the vast majority of subscribers above the desires of a small minority

4    of subscribers whose conduct could consume all available network bandwidth.  Indeed, it

5    would be unfair to subscribers who do ***not*** use bandwidth-intensive P2P protocols to

6    allow their Internet service to be degraded by the few subscribers who do.  *See, e.g.*,

7    *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 265 (2003) (dismissing UCL

8    claim because dealer's commission system was standard in the industry); *Walker v.*

9    *Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1175 (2002) (rejecting UCL

10   claim due to utility of defendant's property inspection fee).

**2.    Comcast's Conduct Is Not "Unlawful"**

12   Mr. Hart also alleges that Comcast's business practices are "unlawful" because he

13   believes they violate the FCC's Internet Policy Statement and Section 1030(a)(5)(A)(1)

14   of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030.  He is mistaken.

15   Mr. Hart's unlawfulness claim fails as it relates to the Internet Policy Statement

16   not only because that document expressly permits reasonable network management, but

17   also because it is a statement of ***policy***, not of prescriptive rules.  *In re Appropriate*

18   *Framework for Broadband Access to the Internet over Wireline Facilities*, 20 F.C.C.R.

19   14986, 14988 n.15 (2005) ("Accordingly, we are not adopting rules in this policy

20   statement.").  That document was issued without the benefit of a notice-and-comment

21   rulemaking proceeding, was not published in the Code of Federal Regulations or even the

22   Federal Register, and by its terms is only a statement of hortatory "principles," not

23   prescriptive rules.  To be sure, the FCC is debating whether to adopt formal rules along

24   the lines of those informal policies.  But unless and until it does, there is no "law" to be

25   violated, and thus no basis for an unlawfulness claim.  *Brock v. Cathedral Bluffs Shale*

26   *Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986); *Wilderness Soc'y v. Norton*, 434 F.3d 584,

27   597 (D.C. Cir. 2006); *Lutheran Church-Missouri Synod v. FCC*, 154 F.3d 487, 489 (D.C.

28   Cir. 1998); *Metro Publ'g Ltd. v. San Jose Mercury News*, 861 F. Supp. 870, 881 (N.D.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

18

1    Cal. 1994) (dismissing "unlawfulness" claim because underlying claim lacked merit).

2    Mr. Hart's claim fails as it relates to Section 1030(a)(5)(A)(1) of the CFAA

3    because Comcast did not violate it.  First, that provision only prohibits activities that

4    "damage" a computer.  *See* 18 U.S.C. § 1030(a)(5)(A)(1); *id.* § (e)(8) (defining "damage"

5    as "any impairment to the integrity or availability of data, a program, a system, or

6    information").  Mr. Hart's computer has not been "damaged."  Because any files he

7    uploaded remain on his computer unless he himself deleted them, the "integrity" of those

8    files has not been impaired.  *Cf. Worldspan L.P. v. Orbitz, LLC*, No. 05-5386, 2006 U.S.

9    Dist. LEXIS 26153, at *14-15 (D. Ill. 2006); *Resdev, LLC v. Lot Builders Ass'n*, No. 04-

10    1374, 2005 U.S. Dist. LEXIS 19099, at *13 n.3 (M.D. Fla. 2005); *Lockheed Martin Corp.*

11    *v. Speed*, No. 05-1580, 2006 U.S. Dist. LEXIS 53108 (M.D. Fla. 2006).  And because

12    Comcast does not manage downloads, the "availability" of information to him has not

13    been affected.  As for any anonymous third parties to whom Mr. Hart may have tried to

14    send pieces of a file, the availability of information to them also has not been impaired.

15    Due to the swarming nature of P2P, if a downloader has trouble connecting with a seeder,

16    her computer instantaneously seeks out a new one.  Mr. Hart obviously knows this, as he

17    cited no specific delay in downloading by anyone.  It bears repeating that the use of

18    "reset" packets in connection with packet-based communication sessions is a ubiquitous

19    industry practice that has inflicted no damage on the nearly infinite number of computers

20    that have received them over time.

21    Second, even if Mr. Hart's computer had been "damaged," which it was not, he

22    has failed to allege that the damage resulted in a "loss," either to him or to anyone else,

23    that exceeds $5,000.  *See* 18 U.S.C. § 1030(a)(5)(B)(i).  A claim under § 1030(a)(5)

24    requires plaintiffs to plead and prove that a defendant's conduct caused a $5,000 loss or

25    other effects (such as physical injury) not relevant here.  *See id.* § 1030(a)(5)(B)(i)-(iv).

26    Here, Mr. Hart claims Comcast has caused a loss in excess of $5,000.  Pl.'s Compl. ¶ 88.

27    However, the CFAA was amended in 2001 in order to limit "loss" to the costs of

28    "responding to an offense, conducting a damage assessment, and restoring the data,

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11); *see also Resdev, LLC*, 2005 U.S. Dist. LEXIS 19099, at *7. Mr. Hart has not alleged that he spent any time or money restoring data or information. Nor has he alleged that he lost any information. He simply states that his losses exceed $5,000. Pl.'s Compl. ¶ 8. That is not enough. *Second Image, Inc. v. Ronsin Photocopy, Inc.*, No. 07-5424, 2007 U.S. Dist. LEXIS 95417, at *3-4 (N.D. Cal. 2007) (Hamilton, J.).

Third, Comcast did not act "without authorization." 18 U.S.C. § 1030(a)(5)(A)(1). Quite the opposite, in fact, as Mr. Hart's contract authorizes Comcast to monitor network congestion and take remedial action. As a result, Mr. Hart asks the Court to focus not on the end (managing P2P seeding), but on the means (transmitting reset packets). To him, the issue here is whether the transmission of reset packets was authorized. Pl.'s Compl. ¶ 88 ("Under the CFAA, it is unlawful to knowingly and without authorization cause the transmission of a program, information, code or command. . . ."). Mr. Hart is mistaken. In Section 1030(a)(5)(A)(i), "without authorization" does not modify "transmission." Rather, it modifies "damage."[10]   *See* 18 U.S.C. § 1030(a)(5)(A)(i) ("Whoever . . . knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."); *Arthur J. Gallagher & Co. v. Edgewood Ptnrs. Ins. Ctr.*, No. 07-06418, 2008 U.S. Dist. LEXIS 8924, *7 (N.D. Cal. 2008); *Speed*, 2006 U.S. Dist. LEXIS 53108, *21 n.8; *Lloyd v. United States*, No. 03-813, 2005 U.S. Dist. LEXIS 18158, at *24 (D.N.J. 2005) ("[T]he term 'without authorization' modifies the element of intentionally causing damage to a computer. To read the statute as Petitioner does requires twisting the statutory language and violates common sense."). Accordingly, it does not matter whether Comcast was authorized to transmit reset packets. What matters is whether it was authorized to temporarily delay congestive transmissions on its network. And it was.

---

[10]    This is in contrast to other the other parts of § 1030(a)(5)(A), in which Congress decided that "without authorization" would modify "access." *See* 18 U.S.C. §§ 1030(a)(5)(A)(ii), (a)(5)(A)(iii).

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS          CASE NO. C-07-06350 PJH

1    Finally, applying the CFAA here would give it a scope unintended by Congress.

2    *See* 136 Cong. Rec. S4568-01, 4614 (Apr. 1990) (statement of Sen. Leahy) (explaining

3    that the CFAA should not "open the floodgates" to litigation); *Shamrock Foods Co. v.*

4    *Gast*, No. 08-0219, 2008 WL 450556, at *4 (D. Ariz. Feb. 20, 2008) ("[T]he legislative

5    history supports a narrow view of the CFAA" because it "[t]he civil component is an

6    afterthought."). The very purpose of Section 1030(a)(5) is to prevent hackers from

7    damaging computer systems or clogging networks with worms or other malware. *See* S.

8    Rep. No. 101-544, at 5-6 (1990) (discussing worm that "quickly replicated itself and

9    spread to computers throughout the network" and "clogged the network for two days");

10    S. Rep. No. 104-357, at 4-5 (1996) (discussing amended § 1030(a)(5)); 139 Cong. Rec.

11    S16421-03 (Nov. 19, 1993) (statement of Sen. Leahy) (discussing worms that "hopelessly

12    clog computer networks"); *Werner-Matsuda*, 390 F. Supp. 2d 479, 496 (D. Md. 2005).

13    Congress cannot have intended for the CFAA, a criminal statute,[11] to be read in a way

14    that prevents P2P management and allows P2P traffic to clog the Internet. In short,

15    imposing liability here would turn the CFAA on its head. Such an "anomalous result" is,

16    to put it mildly, "not easily attributable to congressional intent." *Cedar Rapids v. Garret*

17    *F.*, 526 U.S. 66, 78 n.10 (1999); *American Tobacco v. Patterson*, 456 U.S. 63, 71 (1982).

18    **3.    Comcast's Advertisements Are Not "Untrue or Misleading"**

19    Mr. Hart's fraud claims also fail because Comcast disclosed that it manages

20    network congestion and because none of its advertisements was untrue or misleading.

21    It is axiomatic that a consumer fraud claim cannot stand if the practice in question

22    is disclosed. *See Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 965 (2003); *Shvarts v.*

23    *Budget Group, Inc.*, 81 Cal. App. 4th 1153 (2000). Here, although for a variety of valid

24    reasons Comcast did not provide a blueprint of its network management tools,[12] it did

---

11    A criminal statute first and foremost, the CFAA must be narrowly construed. *Werner-Matsuda*,
26    390 F. Supp. 2d at 499; *see also Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004).

12    Disclosures must strike an appropriate balance between informing consumers and other important
considerations. For example, requiring an ISP to describe its network management in detail would allow
a small but sophisticated group of users to evade those measures altogether. This is a real problem, not an

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

1    disclose that it monitors congestion and takes appropriate steps to prevent congestive

2    transmissions from interfering with the use of its services, including managing them

3    when necessary.  In light of those disclosures, Mr. Hart's fraud claims cannot stand.

4         And assuming for the sake of argument that Comcast's disclosures are deemed

5    inadequate in some way, Mr. Hart's claims still fail because none of the advertisements

6    he cites was misleading.  Under the CLRA, FAL and UCL, a statement is only actionable

7    if it is false or reasonably likely to mislead a reasonable consumer.  *Williams v. Gerber*

8    *Prods. Co.*, 439 F. Supp. 2d 1112, 1115 (S.D. Cal. 2006); *Anunziato v. eMachines, Inc.*,

9    402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005); *Summit Tech., Inc. v. High-Line Med.*

10   *Instruments, Co.*, 933 F. Supp. 918, 931 (C.D. Cal. 1996); *In re All Terrain Vehicle Litig.*,

11   771 F. Supp. 1057, 1061 (C.D. Cal. 1991); *Consumer Advocates v. Echostar Satellite*

12   *Corp.*, 113 Cal. App. 4th 1351, 1361 (2003).  Comcast's advertisements were neither.

13        Most of the representations cited by Mr. Hart are puffery that is not actionable.

14   For example, Mr. Hart cites advertisements in which Comcast offered "lightning speed,"

15   "scorching speed," "mind-blowing speed," "crazy fast speed," and speed that is "way

16   faster than DSL."  Pl.'s Compl. ¶ 40.  Those statements are incapable of measurement,

17   could not possibly have misled Mr. Hart,[13] and, more importantly, could not possibly

---

18   imagined one.  *See* DCIA, *Comment on Petition for Rulemaking*, *supra*, at 8; Rich Karpinski, Telephony
19   Online, *BitTorrent developers seek traffic-shaping route-around* (Feb. 19, 2008) (reporting only a week
     after Comcast filed FCC comments that BitTorrent programmers had used the now-public information to
20   develop a way to "thwart" Comcast's P2P management), available at http://telephonyonline.com/
     broadband/news/bittorrent-traffic-shaping-0219; *see also* Ernesto, *How to Encrypt BitTorrent Traffic*,
21   TorrentFreak.com, available at http://torrentfreak.com/how-to-encrypt-bittorrent-traffic.  Thus, it is no
     answer to say, as Mr. Hart may, that network management should simply be disclosed more completely.
22   If it were, it would be ineffective.  As a result, any state law that requires "disclosure" of actual network
     management would be preempted for the reasons set forth above.  In addition, requiring Comcast to
23   describe its network management in detail would make its contracts hundreds of pages long, and no doubt
     Mr. Hart would take issue with their length.  *See, e.g.*, Pl.'s Compl. ¶ 30.

24   [13]      It bears mention that Mr. Hart has not alleged seeing or relying on any of these advertisements.
     *See* Pl.'s Compl. ¶¶ 40-41.  The only representation he specifically alleges seeing was the statement that
25   he would "enjoy unfettered access" to the Internet.  *Id.* ¶ 55.  But he does not allege whether he saw that
     FAQ before he subscribed or whether he or his counsel simply saw it while preparing his Complaint.
26   Accordingly, he has not satisfied Federal Rule of Civil Procedure 9(b), *see Edwards v. Marin Park, Inc.*,
     356 F.3d 1058, 1066 (9th Cir. 2004), or established causation as required by the UCL and CLRA.  *See*
27   Cal. Civ. Code § 1770(a); Cal. Bus. & Prof. Code § 17204; *see also Wilens v. TD Waterhouse Group,*
     *Inc.*, 120 Cal. App. 4th 746, 754 (2003); *Caro v. Proctor & Gamble*, 18 Cal. App. 4th 644, 668 (1998).

28

1   have mislead a reasonable consumer.   After all, at what point does speed become

2   "scorching"?   And would a reasonable consumer even want speed that was literally

3   "mind-blowing"?  These are innocuous, subjective statements.  They are not actionable.

4          Mr. Hart also claims that he was promised a "maximum upload speed" and speed

5   that was "up to 4 times faster than 1.5 Mbps DSL and up to twice as fast as 3.0 Mbps

6   DSL."  Pl.'s Compl. ¶¶ 42, 40.  Although these statements may seem more objective,

7   they are not relevant to Mr. Hart's claims, as he does not allege that Comcast slows the

8   transmission speed of uploads in any way.  And it doesn't.  At most, an upload might

9   have to be restarted during periods of congestion, and only when necessary to preserve

10  the quality of service being provided to the great majority of subscribers.  But even then,

11  the transmission speed during the actual upload is never slowed.  Thus, advertisements

12  about "speed" could in no way be fraudulent.  In any event, Mr. Hart cites a "maximum"

13  speed "up to" a certain level, not a minimum speed no slower than a certain level –

14  statements that would only be untrue if his service were ***too fast***.

15         The only other representation cited by Mr. Hart is the statement that he would

16  "enjoy unfettered access to all the content, services, and applications that the internet has

17  to offer."  Pl.'s Compl. ¶ 55.  This too is puffery, as no reasonable consumer – let alone a

18  sophisticated user of P2P protocols – would expect that the use of Comcast's service

19  would be unconstrained in any way whatsoever.  Taken literally, this statement would

20  even prevent Comcast from managing its network in order to protect subscribers from

21  spam and worms, as that protection conceivably "fetters" access to the Internet.

22  Reasonable consumers expect Comcast to use its best efforts to filter such things.  Indeed,

23  they rely on Comcast to do so.  Thus, Mr. Hart can only quibble about the propriety of

24  managing congestive P2P traffic as opposed to managing congestive worms or spam –

25  a policy debate better left to the FCC, which is hearing that debate at this very moment.

26  Moreover, this statement comes from a FAQ formerly posted on Comcast's website.

27  Read in its entirety, that FAQ cannot reasonably be understood to suggest that Comcast

28  does not manage its network.  Rather, it stated that subscribers would not be restricted

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

23

based on the type of lawful **content** they choose to view, which is true.[14]   That becomes clear when this FAQ is read in conjunction with Mr. Hart's contract, the AUP, and the other FAQs on Comcast's website – all of which disclose that Comcast offers a shared network, that Comcast monitors its network for congestive transmissions that could affect other users, and that Comcast takes appropriate action to prevent that from happening.

### 4.    Comcast Did Not Breach Any Contractual Duty To Mr. Hart

Mr. Hart's breach of contract claim fails for the simple reason that he has not identified, and cannot identify, a single provision of his contract that has been breached. A breach of contract claim requires not only a contract, but also a breach of that contract, and it is the plaintiff's burden to identify one. *Kapsimallis v. Allstate Ins. Co.*, 104 Cal. App.4th 667, 675 (2002); *Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913 (1971).  Here, Mr. Hart has not identified any provision of his contract that was breached. And it is abundantly clear that he cannot, as Comcast did exactly what it said it would do: monitor its network for congestion and take appropriate remedial measures as needed.[15] More importantly, however, there is no provision in Mr. Hart's contract that promises **not** to engage in network management activities such as those at issue here, and thus no provision that even arguably has been breached by Comcast's doing so.

### 5.    Comcast Did Not Breach Any "Implied" Duty To Mr. Hart

Perhaps recognizing that his contract has not been breached in any way, Mr. Hart has pleaded an alternative claim for breach of an implied covenant of good faith and fair dealing, the gravamen of which is that it is unfair for Comcast to manage P2P traffic.

---

[14]    *See* FAQ: Do You Discriminate Against Particular Types Of Online Content?, previously available at http://www.comcast.net/help/faq/index.jsp?faq=Hot118988 ("Do you discriminate against particular types of online content?  No.  There is no discrimination based on the type of content.  Our customers enjoy unfettered access to all the content, services, and applications that the Internet has to offer. . . .") (Exhibit B to RFJN).

[15]    Mr. Hart alleges that "none of the terms of service state that Comcast can or will impede, limit, discontinue, block or otherwise impair or treat differently" file-sharing applications.  Pl.'s Compl. ¶ 42. That is patently false, as explained above.  Although normally the allegations of a complaint are taken as true for purposes of pre-discovery dispositive motions, they are not if they concern documents that are referenced in the complaint.  *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

1  This claim is defective for a number of reasons.  First, like Mr. Hart's other state law

2  claims, this claim is preempted by federal law.  Second, courts cannot imply a duty not to

3  do something if the parties' contract permits them to do that very thing.  *See Yerkovich v.*

4  *MCA, Inc.*, No. 98-55660, 2000 U.S. App. LEXIS 3259, at *4 (9th Cir. 2000) (citing

5  *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798 (1995)).  But that is just what Mr.

6  Hart is asking this Court to do, as the parties' contract specifically permits Comcast to

7  manage congestive transmissions such as P2P file sharing traffic.  Finally, Comcast's P2P

8  management does not amount to bad faith.  To the contrary, it is essential to the provision

9  of broadband services.  As a matter of law, conduct does not amount to bad faith if it is

10  commercially reasonable under the circumstances.  This is.  *See Foothill Props. v. Lyon*

11  *Copley Corona Assocs.*, 46 Cal. App. 4th 1542, 1551-1552 (1996); *Balfour, Burthrie &*

12  *Co. v. Gourmet Farms*, 108 Cal. App. 3d 181, 191 (1980).

13

14  ## IV.   <u>CONCLUSION</u>

15  As the Ninth Circuit has observed, deciding what our national Internet policy

16  should be "is not our task, and in our quicksilver technological environment it doubtless

17  would be an idle exercise. . . .  Like Heraclitus at the river, we address the Internet aware

18  that courts are ill-suited to fix its flow; instead, we draw our bearings from the legal

19  landscape, and chart a course by the law's words."  *City of Portland*, 216 F.3d at 876.

20  Here, the legal landscape and the letter of the law require that these claims either be

21  rejected or stayed until the FCC does so.

22

23                                        Respectfully submitted,

24  Dated: March 14, 2008                  DRINKER BIDDLE & REATH LLP

25                                         /s/ Michael J. Stortz
                                           _____
26                                         MICHAEL J. STORTZ

27                                         *Counsel for Defendants*

28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105