1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEXINGTON LAW GROUP, LLP
Mark N. Todzo (168389)
Eric S. Somers (139050)
Howard J. Hirsch (213209)
1627 Irving Street
San Francisco, CA 94122
Telephone: (415) 759-4111
Facsimile: (415) 759-4112
mtodzo@lexlawgroup.com

Attorneys for Plaintiff
JON HART

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JON HART, On Behalf of Himself and All
Others Similarly Situated, and On Behalf of the
General Public,

                              Plaintiff,

        vs.

COMCAST OF ALAMEDA, INC., *et al.*; and
DOES 1-250,

                              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. C-07-06350 PJH

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

Date:   June 18, 2008
Time:   9:00 a.m.
Dept:   Courtroom 3
Judge:  Hon. Phyllis Hamilton

1

## TABLE OF CONTENTS

2  I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4       A.   Presumptively True Facts Alleged in the Complaint . . . . . . . . . . . . . . . . . . . . . . . 3

5       B.   Relevant Facts Arising Subsequent to Filing of the Complaint . . . . . . . . . . . . . . 5

6       C.   Disputed Facts Set Forth in Defendants' Memorandum of Law . . . . . . . . . . . . . . 5

7  III.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8       A.   Plaintiff Has Adequately Pled His State Law Claims . . . . . . . . . . . . . . . . . . . . . . 6

9             1.   Plaintiff's Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                 2.   Plaintiff Has Adequately Alleged That Defendants

10                     Breached The Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . 8

11
                 3.   Defendants' Representations That They Will Provide

12                     Unrestricted Internet Access At Specific Speeds, While
                     Selectively And Secretly Restricting Access, Are Likely to

13                     Deceive Reasonable Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14             4.   The Complaint Properly Alleges a Claim For Unlawful

15                     Business Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                 5.   Plaintiff's Allegations Support His Claim For Unfair

16                     Business Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17       B.   Primary Jurisdiction Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18             1.   Plaintiff's Claims Raise Straightforward Issues Of Contract
                     Interpretation And False Advertising That Do Not Require

19                     Agency Expertise To Resolve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20             2.   Staying Or Dismissing This Action In Hopes That FCC
                     Will Act Take Will Not Serve The Purposes Of The

21                     Primary Jurisdiction Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

22             3.   Plaintiff and the Putative Class Would Be Prejudiced by A

23                     Stay Or Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       C.   The Communications Decency Act Does Not Preempt Ordinary

24          Issues of Contract and Unfair Competition Law . . . . . . . . . . . . . . . . . . . . . . . . 23

25  IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3
*Anthony v. Yahoo Inc.*,
   421 F. Supp. 2d 1257 (N.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

4

5
*April Enter, Inc. v. KTTV*,
   47 Cal. App. 3d 805 (Cal. Ct. App. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6
*Badie v. Bank of America*,
   67 Cal. App. 4th 779 (Cal. Ct. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7

8
*Bardin v. DaimlerChrysler Corp.*,
   136 Cal. App. 4th 1255 (Cal. Ct. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

9
*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

10

11
*Bristow v. Lycoming Engines*,
   2007 WL 1106098 (E.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12
*Brown v. MCI WorldCom Network Servs., Inc.*,
   277 F.3d 1166 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

13

14
*Castrol, Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15
*Cel-Tech Communications v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

16

17
*Chabner v. United of Omaha Life Ins. Co.*,
   225 F.3d 1042 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18
*Clark v. Time Warner Cable Co.*,
   -- F.3d --, 2008 WL 1885691 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

19

20
*Comtronics, Inc. v. Puerto Rico Tel. Co.*,
   553 F.2d 701 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21
*Dahl v. Hem Pharmaceuticals Corp.*,
   7 F.3d 1399 (9th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

22

23
*Egan v. Mut. of Omaha Ins. Co.*,
   24 Cal. 3d 809 (Cal. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

24
*Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*,
   436 F. Supp. 2d 1095 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

25

26
*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
   2008 WL 879293 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24, 25

27
*Farmers Ins. Exch. v. Superior Court*,
   2 Cal. 4th 377 (Cal. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28

*GTE.net LLC v. Cox Communications, Inc.*,
    185 F. Supp. 2d 1141 (S.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hauter v. Zogarts*,
    14 Cal. 3d 104 (Cal. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re America Online, Inc.*,
    168 F. Supp. 2d 1359 (S.D. Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*,
    2006 WL 2374742, *12 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Genentech, Inc. Securities Litigation, Inc.*,
    1989 WL 106834 (N.D. Cal. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Matter of Vuze*,
    WC Docket No. 07-52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Paxil Litigation*,
    2002 WL 31375497, *2 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Petition of Free Press, et al.*,
    WC Docket No. 07-52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jones v. Rose*,
    2005 WL 2218134, *29 (D.Or. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Mayer v. Wedgewood Neighborhood Coalition*,
    707 F.2d 1020 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Miles v. America Online, Inc.*,
    202 F.R.D. 297 (M.D. Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Nader v. Allegheny Airlines, Inc.*,
    426 U.S. 290 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Natural Res. Def. Council v. Norton*,
    2007 WL 14283, *14 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Nexans Wires S.A. v. Sark-USA, Inc.*,
    319 F. Supp. 2d 468 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Casa Blanca Convalescent Homes*,
    159 Cal. App. 3d 509 (Cal. Ct. App. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Poseidon Dev., Inc. v. Woodland Lane Estates, LLC*,
    152 Cal. App. 4th 1106 (Cal. Ct. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

*Redding v. MCI Telecommunications Corp.,*
 1987 WL 486960 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rhoades v. Avon Products, Inc.*
 504 F.3d 1151,  (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Southland Sod Farms v. Stover Seed Co.,*
 108 F.3d 1134 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Southwest Marine, Inc. v. Triple A Machine Shop, Inc.,*
 720 F. Supp. 805 (N.D. Cal. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Specht v. Netscape,*
 150 F. Supp. 2d 585 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ting v. AT&T,*
 319 F.3d 1126, 1136 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Toro Co. v. Textron, Inc.,*
 499 F. Supp. 241 (D. Del. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Culliton,*
 328 F.3d 1074 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Gen. Dynamics Corp.,*
 828 F.2d 1356, 1363 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*W.L. Gore & Assocs., Inc. v. Totes Inc.,*
 788 F. Supp.800, 809 (D. Del.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williams v. Gerber Products Co.,*
 2008 WL 1776522 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**STATUTES & CODES**

18 U.S.C. § 1030(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

47 U.S.C. § 230(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

47 U.S.C. § 414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cal. Civ. Code § 1770(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cal. Civ. Code § 1770(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cal. Civ. Code § 1770(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# I.   INTRODUCTION

Defendants Comcast Corporation and 17 of its California subsidiaries ("Defendants") seek judgment on the pleadings to obtain either a dismissal or stay of Plaintiff's claims on the basis of their contentions that: (1) Plaintiff's claims fail under California law; (2) the primary jurisdiction doctrine applies since Federal Communications Commission ("FCC") is allegedly addressing the very issues raised by Plaintiff's lawsuit; and (3) the Communications Decency Act ("CDA") preempts Plaintiff's claims.  Defendants are wrong on all three counts.

Plaintiff's Complaint alleges claims that are valid under California law.  This case involves a classic "bait and switch."  As alleged in the Complaint, Defendants advertise, market and sell their internet service based on promises that they will provide high-speed and unrestricted access to all of the legal content and applications the internet has to offer. Nevertheless, beginning on or about May 2007, Defendants began blocking and interfering with their customers' access to, and use of, certain lawful internet applications.  By doing so, Defendants breached their agreements to provide unfettered access to the internet at specific, objective speeds, and they disappointed the reasonable expectations of their customers in breach of the covenant of good faith and fair dealing.  Moreover, Defendants' advertising and sale of high-speed, unrestricted internet access, while at the same time slowing and restricting such access, is likely to deceive ordinary consumers of Defendants' internet service in violation of California consumer protection statutes.  Because the allegations in the Complaint allege valid claims under California law, the Court should reject Defendants' argument that Plaintiff's claims are legally insufficient.

Deferral of Plaintiff's claims to the FCC pursuant to the primary jurisdiction doctrine is unnecessary and improper.  Plaintiff's state law breach of contract, false advertising and unfair competition claims raise issues that are within the competence of this Court and do not require FCC expertise to resolve.  For example, FCC's expertise is not required to determine which documents form the contract between Defendants and their customers under California law or whether Defendants breached those agreements.  Nor is it required to determine whether consumers are likely to be misled by Defendants' advertising and conduct.  While Defendants

1  argue that the FCC's investigation into what constitutes "reasonable network management"

2  under its Internet Policy Statement is dispositive of this case, the principal issue here is not

3  whether Defendants engaged in reasonable network management, but whether they baited

4  customers with false and misleading representations concerning unfettered service and then

5  switched the unfettered service for a restricted one.[1] That, and the related determinations that

6  form the basis of Plaintiff's claims, can and should be made by this Court.

7        Defendants' preemption argument also fails. As the Ninth Circuit recently found,

8  the CDA was not intended to, and does not, widely displace state laws as applied to the internet.

9  Therefore, Defendants' contractual breaches, deceptive and false advertising, and unfair and

10  unlawful conduct do not "magically become lawful" simply because Defendants' conduct relates

11  to the internet. *See Fair Housing Council of San Fernando Valley v. Roomates.com, LLC*, 2008

12  WL 879293, *3 (9th Cir. 2008).

13        Defendants' Motion should further be denied because it completely disregards the

14  proper standard of review. In ruling on a motion for judgment on the pleadings, the Court must

15  take all the allegations in the pleadings as true and construe them in the light most favorable to

16  the nonmoving party. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 360

17  (9th Cir. 2005). Instead of applying this presumption, Defendants ignore the allegations of

18  Plaintiff's Complaint altogether in favor of a host of articles posted on the internet.[2] Such

19  "evidence" would be inadmissible hearsay at trial and is clearly not entitled to any consideration

20  at the pleadings stage. Therefore, the Court should deny Defendants' Motion.

21

22

23       [1]    Indeed, the FCC's Internet Policy Statement is only relevant to a portion of two of

24  Plaintiff's seven causes of action. Specifically, Plaintiff alleges that Defendants' violations of the
Internet Policy Statement constitute one of four predicate unlawful acts in support of his claim for

25  unlawful business practices under California's Unfair Competition Law ("UCL") and as one of
several factors supporting his claim for unfair business practices under the UCL. Because these

26  allegations are unnecessary to Plaintiff's Complaint, and to avoid any further distractions from the
central focus of the case, Plaintiff intends to amend his complaint to delete any reference to the FCC

27  internet policy statement. *See* Complaint, ¶¶ 3, 32, 48, 49, 90, 96; *and* Prayer for Relief, ¶ F.

28       [2]    In fact, there is not a single cite to the Complaint in the 25-page memorandum
supporting Defendants' Motion.

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

## II.    FACTUAL BACKGROUND

### A.    Presumptively True Facts Alleged in the Complaint.

Defendants market and/or sell the Service.  Complaint, ¶¶ 6-24.  The Service is designed to provide Defendants' customers with high-speed access to the internet.  *Id.* ¶ 36. Accordingly, Defendants refer to, market and sell the Service under the name "High Speed Internet."  *Ibid*.  The speed at which a user is able to access the internet is one of the most important aspects of internet service.  *Id.* ¶ 37.  Defendants' advertising and marketing of the Service revolves around claims regarding the speed of the Service.  Complaint, ¶ 40. Defendants' representations regarding the download and upload speeds range from specific factual statements such as "up to 4 times faster than 1.5 Mbps DSL and up to twice as fast as 3.0 Mbps DSL" to more general statements such as "Stop crawling the web and start burning rubber with our Performance (6 Mpbs) service!"  *Ibid*.  While all of Defendants' advertising touts the speed at which users may upload and download content from the internet, none of their advertisements or public statements made prior to the filing of the Complaint state that Defendants will impede, limit, discontinue, block or otherwise impair or treat differently the Blocked Applications.[3]  *Id.* ¶¶ 40, 42.

Internet access speed is particularly important for individuals like Plaintiff who use certain internet applications involving downloading and/or uploading large files, including peer to peer (P2P) file sharing applications and lotus notes (altogether referred to as the "Blocked Applications").  Complaint, ¶¶ 38, 39.  In fact, Plaintiff upgraded his internet service to Defendants' High-Speed Internet Performance Plus in September 2007 in order to gain faster uploads and downloads to and from the internet to enable him to use the Blocked Applications. *Id.* ¶ 41.  The Blocked Applications are widely used for a variety of lawful purposes, including sharing large software and video files.  *See generally, In re Matter of Vuze*, WC Docket No. 07-52, pp. 6-9 (Defendants' Request for Judicial Notice ("Defendants' RJN"), ¶ 4).

The Terms and Conditions presented to customers upon on-line purchase of the

---

[3]    After repeatedly denying that they had engaged in the underlying conduct alleged in the Complaint, Defendants have now, subsequent to the filing of the Complaint, admitted that they impair use of the Blocked Applications.

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

1    Service promise explicit speeds for both downloads and uploads.  Complaint, ¶ 42.  The Terms

2    and Conditions state: "Comcast High-Speed Internet service tiers range from 4.0 to 16.0 Mbps

3    download speed (maximum upload speed from 384Kbps to 768Kbps respectively)."  *Ibid.*; *see*

4    *also* Plaintiff's Request for Judicial Notice ("Plaintiff's RJN"), Exh. 1.  Defendants also promise

5    "unfettered access to all the internet has to offer."  Complaint, ¶ 1.

6            In addition, customers of the Service are provided with a pop-up window

7    containing the Comcast High-Speed Internet Subscriber Agreement ("Subscriber Agreement")

8    when purchasing the Service from Defendants' website.  *Id.* ¶ 42.  While only a few lines of text

9    are visible in the pop-up screen, the Subscriber Agreement is 22 single-spaced pages of text.

10   *Ibid.*  The Subscriber Agreement promises that Defendants will provide customers with the

11   Service, which is defined as having the specific speed attributes discussed above.  Plaintiff's

12   RJN, Exh. 2.  The Subscriber Agreement further promises that the "Service will allow you to

13   access third parties, including without limitation, content providers, on-line services and other

14   providers of goods, services and information."  *Ibid.*  The Subscriber Agreement does not

15   reference "peer to peer", P2P, or "network management."  *Ibid.*  Although the Subscriber

16   Agreement includes a section regarding "Prohibited Uses of the Service," which prohibits use in

17   violation of state or federal law and use as an Internet service provider, it does not prohibit P2P

18   file sharing.  *Ibid.*

19           Defendants also use a number of documents similar to the Subscriber Agreement.

20   Complaint, ¶ 42.  As with the Subscriber Agreement, these "terms of service" or "terms of use"

21   promise use of high-speed internet, specifically reference the speeds at which a customer can

22   expect to both download and upload content, and do not inform customers that Defendants may

23   limit, impair, impede, block or otherwise "manage" customers' internet usage.  *Ibid.*

24           Notwithstanding Defendants' representations, advertisements and promises

25   regarding the Service, Defendants actively, secretly, and intentionally impede their customers'

26   use of the Blocked Applications.  *Id.* ¶¶ 2, 44-45.  Defendants block and interfere with use of the

27   Blocked Applications by sending hidden messages or "spoof packets" to the computers of users

28

1    of the Blocked Applications. *Id.* ¶ 45. These spoof packets immediately terminate any

2    communication via the Blocked Application by the recipient's computer. *Ibid.*

3    As a result of Defendants' use of spoof packets, Plaintiff and the Class

4    "experience download and upload speeds for the Blocked Applications that are exponentially

5    slower" than those promised by Defendants. *Ibid.* Contrary to Defendants' promise to provide

6    "unfettered" access to the internet, Defendants' severely fetter use of the Blocked Applications

7    by Plaintiff and the Class. *Id.* ¶ 1. Plaintiff and the Class paid higher prices for the Service in

8    order to obtain faster connection speed. *Id.* ¶ 33. Defendants' intentional and undisclosed

9    interference with the Blocked Applications thus significantly reduced the value of the Service for

10    Plaintiff and the Class. *Id.* ¶¶ 33, 47, 53, 62, 75, 81, 91, 98.

11    **B.    Relevant Facts Arising Subsequent to Filing of the Complaint.**

12    Defendants initially denied that they blocked or in any way impaired the Blocked

13    Applications. For example, in October 2007 Defendants stated: "we do not block access to any

14    Web site or applications, including BitTorrent" and "we never prevent P2P activity, or block

15    access to any P2P applications." Defendants' RJN, Exh B. However, subsequent to the filing of

16    Plaintiff's Complaint, Defendants changed their tune. In January 2008, Defendants revised their

17    Acceptable Use Policy to concede that they take action against use of certain internet

18    applications by "delaying peer-to-peer sessions" and "limiting the number of peer-to-peer

19    sessions." Comcast Acceptable Use Policy for High-Speed Internet Services, revised January

20    25, 2008 (http://www6.comcast.net/terms/use/). Although Defendants claim in their Motion that

21    interfering with the Blocked Applications is "absolutely necessary"(Motion, pp. 3-5, 17:27),

22    over a month ago Defendants announced that they will stop blocking and/or interfering with the

23    Blocked Applications. *See* Comcast and BitTorrent Form Collaboration to Address Network

24    Management, Network Architecture and Content Distribution, March 27, 2008

25    (http://www.prnewswire.com/cgi-bin/stories.pl?ACCT=109&STORY=/www/story/03-27-2).

26    **C.    Disputed Facts Set Forth in Defendants' Memorandum of Law.**

27    Although Defendants style their Motion as one for judgment on the pleadings,

28    they rely on a host of facts that are not subject to judicial notice, are directly contradicted by the

1    allegations of the complaint and are contrary to the weight of evidence.  Sections II.A and II.B of

2    Defendants' Motion, pages 3-8:6 are entirely based on such facts.  Accordingly, the Court should

3    disregard this portion of Defendants' brief in its entirety.  *See Hal Roach Studios, Inc. v. Richard*

4    *Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).**4**

5                                        **III.    DISCUSSION**

6        **A.    Plaintiff Has Adequately Pled His State Law Claims.**

7                This case centers on Defendants' breach of promises in their contracts and

8    advertising to provide unrestricted access to all internet applications at specific speeds.  While

9    Defendants promise "unfettered access" and download and upload speeds between "4.0 to 16.0

10   Mbps" and "384Kbps to 768Kbps" respectively **5**, Defendants intentionally block use of certain

11   applications thereby exponentially reducing the download and upload speeds below those

12   promised.  This conduct, all of which took place in California, violates California law as

13   properly alleged in Plaintiff's breach of contract, bad faith, false advertising and unfair

14   competition claims.

15                        **1.    Plaintiff's Breach of Contract Claim.**

16               Plaintiff's first cause of action properly alleges a claim for breach of contract.  A

17   cause of action for breach of contract requires four elements: (1) a contract; (2) plaintiff's

18   performance; (3) defendant's breach; and (4) damages.  *See Poseidon Dev., Inc. v. Woodland*

19   *Lane Estates, LLC*, 152 Cal. App. 4th 1106, 1111 (Cal. Ct. App. 2007).  Here, Plaintiff alleges

20   that: (1) he and the other Class members entered into contracts with Defendants to pay monthly

21   fees in order to obtain the Service; (2) Plaintiff and Class members performed their obligations

22   under the contract by paying their monthly fees; (3) Defendants unjustifiably breached the

23   contract by restricting Plaintiff's and the Class' access to, and use of, the Service; and (4)

24   Plaintiff and Class members were damaged by Defendants' breach of the contracts since they did

25   _____

26         **4**        While the Court has discretion to treat a motion for judgment on the pleadings as one
     for summary judgment, to do so here would be inappropriate as Plaintiff has not yet had an
27   opportunity to conduct any discovery on the merits of his claims.  *See Mayer v. Wedgewood*
     *Neighborhood Coalition*, 707 F.2d 1020, 1021 (9th Cir. 1983).

28         **5**        Complaint, ¶ 42; *and* Plaintiff's RJN, Exh 1.

1    not receive the Service for which they paid.  Complaint, ¶¶ 1, 33, 43, 44, 51-53.  These

2    allegations state a proper claim for breach of contract under California law.

3              Ignoring these allegations of the Complaint, Defendants argue that Plaintiff has

4    not identified any provision of his contract that has been breached.  Motion, p. 24:8.  To the

5    contrary, Plaintiff specifically alleges that the Terms and Conditions which form the basis of the

6    contract between Defendants and their customers promise that Defendants will provide

7    customers, including Plaintiff, with internet access at specifically defined speeds.  Complaint, ¶

8    42.  Plaintiff also alleges that Defendants promised to provide customers, including Plaintiff,

9    with unrestricted internet access.  *Id.* ¶¶ 1, 2.  Since Plaintiff alleges that Defendants breached

10   these contractual promises, Defendants' argument must be rejected.

11             Defendants also argue that they cannot be liable for breaching these promises

12   because their contracts allegedly authorize them to "monitor [their] network for congestion and

13   take appropriate remedial measures as needed."  Motion, p. 24:13-14.  However, Defendants do

14   not identify any provision of their contracts that allegedly authorize them to interfere with their

15   subscribers' use of the Blocked Applications.  Given their lengthy dissection of the legalese

16   contained in the Motion's "Background" section, Defendants are presumably relying on certain

17   vague language in their Acceptable Use Policy ("AUP") as "authorization" for their interference

18   with the Blocked Applications.  *See id.* at 8.

19             The AUP cannot and does not provide such authorization, as it is not even part of

20   the contract between Defendants and their customers.  Defendants apparently contend that the

21   AUP is part of the Subscriber Agreement because the AUP is referenced in other documents that

22   form the basis of the agreement between the parties.  Motion, p. 8.  However, the AUP is only

23   part of the agreement between the parties to the extent that customers had an opportunity to

24   review, understand and agree to it.  *See, e.g., Specht v. Netscape*, 150 F. Supp. 2d 585, 593

25   (S.D.N.Y. 2001).  When signing up for the Service on Defendants' website, a potential customer

26   neither signs the AUP nor is required to click on a box affirmatively agreeing to the terms of the

27   AUP.  The AUP never even appears in a pop-up window nor is it otherwise presented to a

28   prospective customer.  Rather, the AUP is buried in an interconnecting series of links on

- 7 -

1  Defendants' website.  Since it is not part of the contract between the parties, the AUP is

2  irrelevant to Plaintiff's breach of contract claim.[6]

3          Even if it is part of the contract, the AUP does not authorize Defendants to

4  secretly interfere with their customers' use of the Blocked Applications.  Defendants claim they

5  are authorized to do so by a vague statement in the AUP indicating that customers should ensure

6  that their use of the Service does not "restrict, inhibit, interfere with, or degrade any other user's

7  use of the Service, nor represent (in the sole judgment of Comcast) an overly large burden on the

8  network."  Motion, p. 8.  A reasonable consumer would not understand this vague prohibition

9  (and others like it in the AUP) to allow Defendants to secretly block routine use of common P2P

10 applications, particularly since: (1) the AUP specifically refers to malicious practices like

11 posting or sending viruses as falling within this restriction; and (2) the AUP does not inform

12 customers that use of P2P applications may constitute a burden on the network, let alone an

13 overly large one.  Defendants' RJN, Exh. 1.  Notably, after the filing of this suit, Defendants re-

14 wrote their AUP to specifically disclose that they interfere with the Blocked Applications.  If

15 Defendants believed that the original AUP adequately disclosed and authorized their interference

16 with the Blocked Applications, why then did they find it necessary to re-write the AUP to

17 expressly make those disclosures? [7]

18                 **2.    Plaintiff Has Adequately Alleged That Defendants Breached The**
                          **Covenant of Good Faith and Fair Dealing.**
19

20          California law imposes a covenant of good faith and fair dealing on every

21 contractual agreement entered into within the state.  *Egan v. Mut. of Omaha Ins. Co.,* 24 Cal. 3d

22 809, 818 (Cal. 1979).  Plaintiff's second cause of action adequately alleges a breach of that

    covenant.
23
            Under the covenant, "it is implied in law that a party to a contract will not do
24
    anything which would deprive the other party of the benefits of the contract."  *April Enter, Inc.*
25

26      [6]      At most, there is a factual dispute regarding whether the AUP is part of the contract
        – a factual dispute that is improper to resolve on the pleadings.

27      [7]      Again, at best there is a factual dispute that is improper to resolve at the pleadings
        stage as to whether the AUP (if part of the contract) authorized Defendants' interference with the
28      Blocked Applications.

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

1   *v. KTTV*, 147 Cal. App. 3d 805, 816 (Cal. Ct. App. 1983).  Here, while the contract promises

2   unfettered access to the internet at specifically defined speeds, Defendants intentionally and

3   without notice, act to impair access by Plaintiff and the Class, thereby reducing the upload and

4   download speeds far below those promised.  *Id.* ¶¶ 1, 42, 47, 57-59.[8]  Defendants have thus

5   deprived Plaintiff and the Class of the benefits of the agreement in breach of the covenant.

6           Defendants argue that Plaintiff's allegations fail because: (1) their contract

7   authorizes them to impede their customers' use of the Service; and (2) their interference with the

8   Service is "commercially reasonable."  Motion, p. 25.  Defendants' arguments regarding their

9   authorization to interfere with the Blocked Applications fails for the reasons discussed above.[9]

10  Defendants' contention that their interference with the Blocked Applications is commercially

11  reasonable fails because a determination of what constitutes "commercially reasonable" conduct

12  is a fact intensive inquiry that is not suited for a motion on the pleadings.

13          Furthermore, even if the Court were to adjudicate the merits of Defendants'

14  "commercially reasonable" defense at this time, Defendants' actions subsequent to the filing of

15  the Complaint demonstrate that their prior conduct was not, as they claim, "essential to the

16  provision of broadband services."  Motion, p. 25:8-9.  Rather, Defendants have now shown that

17  they are perfectly capable of both informing their customers of their interference with the

18  Blocked Applications and agreeing to stop engaging in such interference in the future.[10]

19  ───────────────

20      [8]    Defendants attempt to avoid the import of these allegations by misconstruing the
    nature of Plaintiff's claims.  Defendants argue that the gravamen of Plaintiff's implied covenant
21  claim is "that it is unfair for Comcast to manage P2P traffic."  Motion, p. 24:21.  This is not the case.
    From the very first paragraph of the Complaint, it is clear that Plaintiff's claims center on
22  Defendants' bait and switch.

23      [9]    Notably, even if Defendants are correct that the AUP is part of the parties' contract
    and gives them discretion to secretly interfere with their customers' use of the Service for lawful
24  internet applications, Defendants have an obligation under the implied covenant of good faith and
    fair dealing to exercise their unilateral discretion in accordance with the parties' reasonable
25  expectations.  *See, e.g., Badie v. Bank of America*, 67 Cal. App. 4th 779, 795 (Cal. Ct. App. 1998).
    Since Plaintiff's Complaint alleges that Defendants' conduct disappoints the reasonable expectations
26  of Plaintiff and Class members (Complaint, ¶ 60), Plaintiff has adequately alleged a claim for breach
    of the implied covenant even if Defendants' interpretation of the AUP is correct.

27      [10]   Even if Defendants are able to prove that their blockage of the Blocked Applications
    was necessary, they will never be capable to proving that failing to inform their customers of such
28  blockage and affirmatively lying about it were ever reasonable, let alone necessary.

1    Comcast Acceptable Use Policy for High-Speed Internet Services, revised January 25, 2008

2    (http://www6.comcast.net/terms/use/).  Therefore, Defendants' commercial reasonableness

3    defense also fails on the merits.

4            **3.    Defendants' Representations That They Will Provide Unrestricted**
                **Internet Access At Specific Speeds, While Selectively And Secretly**
5                **Restricting Access, Are Likely to Deceive Reasonable Consumers.**

6            Plaintiff's third, fourth and fifth causes of action allege violations of the

7    Consumer Legal Remedies Act ("CLRA"), the fraudulent prong of the Unfair Competition Law

8    ("UCL"), and the False Advertising Law ("FAL").  All three of these California consumer

9    protection laws prohibit businesses from disseminating false or misleading advertisements.

10   Under California law, advertisements and conduct are false and misleading if they are likely to

11   deceive an ordinary consumer.  *See Williams v. Gerber Products Co.*, 2008 WL 1776522, *3

12   (9th Cir. 2008).  Defendants' advertisements promising fast and unrestricted internet access,

13   while Defendants secretly slow and restrict such access, is likely to deceive ordinary consumers

14   in violation of the CLRA, UCL, and FAL.

15           The Complaint adequately alleges deceptive advertising and business practices

16   under California law.  The speed at which a user is able to access the internet is one of the most

17   important aspect of internet service.  Complaint, ¶ 37.  This factor is particularly important to

18   Plaintiff and the Class, who need high speed access to run the Blocked Applications.  *Id.* ¶¶ 37-

19   39, 41.  Defendants are aware of the importance to consumers of internet connection speed,

20   which is why the two primary features of the advertised Service are upload and download

21   speeds.  *Id.* ¶ 40.  Defendants additionally advertise that the Service provides users with

22   "unfettered access to all the internet has to offer."  *Id.* ¶ 1.  Despite these widely disseminated

23   representations, Defendants restrict access to certain internet applications, thereby inhibiting the

24   speed at which users can both upload and download information to and from the internet.  *Id.*

25   ¶¶44, 72, 79.

26           Defendants' representations regarding speed and access are likely to deceive

27   ordinary consumers, including Plaintiff and the Class.  Such individuals would believe the

28   representations to mean what they say – that consumers will be able to use their choice of

1    internet applications and do so at the advertised speeds.  Yet, due to Defendants' undisclosed

2    interference, Plaintiff and the Class are unable to do so with regard to the Blocked Applications.

3    Whether an advertisement or business practice is likely to deceive an ordinary

4    consumer is a question of fact that is not appropriate for a determination on the pleadings.

5    *Gerber Products Co., supra,* at *3.  Defendants nevertheless seek a determination on the

6    pleadings that their representations regarding unrestricted high speed internet access are not

7    deceptive despite their admitted interference with certain internet applications.  Such a

8    determination is contrary to the facts alleged in the Complaint, which are deemed true for

9    purposes of this motion, as well as common sense and the law.

10    Defendants contend that their advertisements are not misleading because: (1) they

11    disclose the conduct that conflicts with their advertisements; and (2) no reasonable person would

12    believe their advertisements.  The recent Ninth Circuit decision in *Williams v. Gerber Products*

13    *Company*, 2008 WL 1776522 (9th Cir. 2008), refutes both of Defendants' arguments.

14    First, as discussed above, Defendants do not disclose that they interfere with the

15    Blocked Applications and that such interference materially impairs users' connection speeds.

16    Moreover, even if Defendants' hidden, twelve page AUP serves as a disclosure, the

17    advertisements are nevertheless false and deceptive under California law.  In *Gerber*, the

18    defendant argued that it could not be held liable for falsely suggesting the presence of certain

19    fruits on a food label since the side panel of the package provided an accurate description of the

20    product ingredients.  The court rejected that argument, finding that:

21
22    we disagree with the district court that reasonable consumers
     should be expected to look beyond misleading representations on
     the front of the box to discover the truth from the ingredient list in
23    small print on the side of the box.

24    *Id.* at *4.  The same is true here.  Vague statements regarding "network management" or

25    degrading "other user's use of the Service" buried in a 12-page document that is buried on

26    Defendants' website cannot possibly serve to remedy Defendants' widely disseminated and

27    publicized advertisements regarding unrestricted access to the internet at specific, very high

28    speeds.

1    Defendants next argue that their representations and advertisements regarding

2    speed and access are mere puffery. Not so. Defendants make specific factual claims regarding

3    the upload and download speeds that will be attained by users of the Service. For example,

4    Defendants promise that users will attain between 4 and 16 Mbps for downloads and between

5    386Kbps and 784Kbps for uploads. Complaint, ¶ 42. These allegedly false factual assertions are

6    capable of measurement. Statements such as these, which promise a specific result, are not

7    puffery as a matter of law. *See, e.g., Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134,

8    1145 (9th Cir. 1997) (summary judgment denied because specific claim that a grass product

9    requires "50% Less Mowing" is not puffery); *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 946

10    (3d Cir. 1993) (after bench trial, court of appeal held that specific claim of product superiority

11    based on product testing is not puffery); *W.L. Gore & Assocs., Inc. v. Totes Inc.,* 788 F. Supp.

12    800, 809 (D. Del.1992) (numerical comparison that a product is seven times more breathable

13    "gives the impression that the claim is based upon independent testing" and "is not a claim of

14    general superiority or mere puffing"); *and Toro Co. v. Textron, Inc.,* 499 F. Supp. 241, 249-53 &

15    n.23 (D. Del. 1980) (claims concerning specific product attributes are not puffery).

16    Defendants claim that the allegations regarding specific speeds are not relevant to

17    Plaintiff's claims because Plaintiff "does not allege that Comcast slows the transmission speed of

18    uploads in any way." Motion, p. 23:7-8. Defendants are once again ignoring the Complaint,

19    which alleges:

20    Plaintiff and the Class experience internet ***upload and download***
21    speeds for the Blocked Applications that are exponentially slower
than the speeds advertised by Defendants and/or experience
22    complete blockage of their file sharing applications.

23    Complaint, ¶ 44 (emphasis added).

24    Also ignoring the allegations regarding objective speed representations in the

25    Complaint, Defendants focus instead on allegations regarding their corollary statements

26    concerning the speed of the Service (such as "lightning fast") and argue that those claims are

27    puffery. However, such statements must be read in the context of Plaintiff's claims and

28    Defendants' advertising as a whole. Plaintiff is not alleging that Defendants' advertisements are

1  deceptive because the Service is not literally as fast as lighting.  Instead, Plaintiff alleges that the

2  combined impact on consumers of representations regarding "lightning fast" connection speed,

3  taken together with the representations regarding specific download and upload speeds and

4  unrestricted access to the internet, is likely to deceive users of the Service into believing that

5  their ordinary use of legal internet applications will not be intentionally slowed or stopped by

6  Defendants.  As the Court held in *Gerber*, even statements which might, standing alone,

7  constitute puffery, can contribute to the overall deceptiveness of a business practice as a whole.

8  *Gerber,* 2008 WL 1776522 at *4, n.3.  *See also Hauter v. Zogarts*, 14 Cal. 3d 104, 113 (Cal.

9  1975) (defendant liable for advertising product as "completely safe" while failing to disclose

10  dangers).

11         Defendants also ignore the Complaint's allegations regarding Defendants'

12  material omissions concerning their secret interference with the Blocked Applications.  Plaintiff

13  alleges that he upgraded to the Service in order to enable him to use the Blocked Applications.

14  Complaint,   ¶ 41.  Had he been aware that Defendants blocked and interfered with the Blocked

15  Applications, he would not have paid extra for this upgrade.  Therefore, Plaintiff obtained less

16  than the full value of the service for which he paid.  *Id.* ¶¶ 1, 3, 4, 33, 75, 81.  These allegations

17  support a claim for false advertising and deceptive conduct based on material omissions under

18  California law.  *See, e.g. Bristow v. Lycoming Engines*, 2007 WL 1106098, *7 (E.D. Cal. 2007).

19         **4.    The Complaint Properly Alleges a Claim For Unlawful Business Practices.**

20         Under the UCL, an unlawful business practice is "anything that can properly be

21  called a business practice and that at the same time is forbidden by law."  *Farmers Ins. Exch. v.*

22  *Superior Court*, 2 Cal. 4th 377, 491 (Cal. 1992).  As detailed above, Plaintiff properly alleges

23  that Defendants violated both the CLRA and the FAL.  Plaintiff's sixth cause of action for

24  unlawful acts under the UCL is predicated on these violations.  Complaint, ¶¶ 85-87.

25  Consequently, Plaintiff has adequately alleged a claim for unlawful acts under the UCL.

26  *Farmers Ins. Exch.*, 2 Cal. 4th at 491.

27         Plaintiff also alleges that Defendants have violated FCC Policy Statement 05-151

28

1   and the Computer Fraud and Abuse Act ("CFAA") in support of his unlawful claim under the

2   UCL. Complaint, ¶¶ 88-90. As noted above, Plaintiff intends to voluntarily amend his

3   Complaint to delete any references to the FCC Policy Statement, thereby mooting Defendants'

4   arguments regarding this issue.

5        As for the CFAA, the law prohibits the unauthorized transmission of messages to

6   another's computer that causes aggregate damage in excess of $5,000. *See* 18 U.S.C. §

7   1030(a)(5). The Complaint adequately alleges that Defendants violated the CFAA since Plaintiff

8   alleges that: (1) Defendants transmit hidden messages, or spoof packets, which block and

9   interfere with access to certain internet applications by Plaintiff and the Class; (2) Defendants

10  were not authorized to send the spoof packets; and (3) Plaintiff and the Class suffered total

11  damages in excess of $5,000. Complaint, ¶¶ 44-47. These allegations support a claim for

12  violation of the CFAA, which in turn constitutes an unlawful business practice under the UCL.

13       Defendants argue that Plaintiff's allegations regarding the CFAA fail because: (1)

14  Plaintiff's computer has not been damaged; (2) Plaintiff has not alleged that he or anyone else

15  has suffered a loss exceeding $5,000; and (3) Defendants did not act without authorization.

16  Motion, pp. 19-20. Again, Defendants' arguments ignore the factual allegations of the

17  Complaint and seek a factual determination that "Comcast did not violate [the CFAA]" (Motion,

18  p. 19:2-3), rather than a legal determination of whether Plaintiff has adequately alleged a claim

19  under the UCL based on alleged violations of the CFAA. Such a determination is simply beyond

20  the scope of this Motion.

21       For example, Defendants rest their argument that Plaintiff's computer has not

22  suffered any damage on their disputed factual claim that "Comcast does not manage downloads."

23  Motion, p. 19:12. This factual assertion is contrary to the allegations in the Complaint.

24  Complaint, ¶ 44 ("Plaintiff and the Class experience internet upload and download speeds for the

25  Blocked Applications that are exponentially slower . . . and/or experience complete blockage of

26  their file sharing applications."). Similarly, Defendants' argument that Plaintiff has not alleged a

27  loss of $5,000 or more flatly ignores the Complaint's allegation that, by violating the CFAA,

28

1    "Defendants have caused Plaintiff and the Class to suffer damage and loss as set forth above, in

2    an aggregate amount in excess of $5,000."  Complaint, ¶ 88.  This is sufficient to allege a claim

3    under the CFAA.  *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474 (S.D.N.Y.

4    2004) ("It is also clear that the remedial costs contemplated by 'loss' are not limited to the cost

5    of actual repairs themselves, but include costs incurred 'because of interruption of service.'").

6         Defendants' argument that they did not act "without authorization" as required

7    under the CFAA fails for the same reasons that their arguments regarding breach of contract and

8    false advertising fail – Defendants were not authorized to block and interfere with the Blocked

9    Applications.  Rather, as detailed in the Complaint and herein, Defendants promised the exact

10   opposite – that they would not block or interfere with access by Plaintiff and the Class to the

11   internet.  Complaint, ¶¶ 1, 42, 56, 72, 79.

12        Defendants attempt to confuse the issue by arguing that under the CFAA,

13   "without authorization" modifies damage rather than transmission.  This analysis is irrelevant to

14   this Motion, as Plaintiff has alleged that Defendants were unauthorized to transmit the spoof

15   packets ***and*** to damage his and the Class' computers.  Accordingly, irrespective of whether

16   Congress intended "without authorization" to modify "transmission" or "damage," Plaintiff has

17   adequately alleged the "without authorization" element of a claim under the CFAA.  *See In re*

18   *America Online, Inc.*, 168 F. Supp. 2d 1359, 1371 (S.D. Fla. 2001) (CFAA "would cover anyone

19   who intentionally damages a computer, *regardless of whether they were an outsider or an*

20   *insider otherwise authorized to access the computer . . . .*" (emphasis in original)).

21        Application of the CFAA to Defendants' conduct will not, as Defendants claim,

22   overextend its intended scope.  Rather, such application is consistent with prior authority, which

23   have upheld claims under the CFAA against internet service providers ("ISPs") for transmission

24   of software programs or other data that allegedly damaged their customers' computers.  *Ibid.*

25   (customers properly stated claim under CFAA against AOL for its transmission of software

26   update that damaged customers' computers); *see also Miles v. America Online, Inc.*, 202 F.R.D.

27   297, 306 (M.D. Fla. 2001) (class certification of CFAA claim against ISP).  Here, Plaintiff

28

alleges that Defendants transmit code to the computers of he and the Class, and that such code damages the computers by prohibiting use of the Blocked Applications.  These allegations are fully consistent with the scope of the CFAA as interpreted by the courts.

### 5. Plaintiff's Allegations Support His Claim For Unfair Business Practices.

Conduct is unfair under the UCL if it : (1) is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers; or (2) violates a legislative policy.  *See Cel-Tech Communications v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999); *and People v. Casa Blanca Convalescent Homes*, 159 Cal. App. 3d  509, 530 (Cal. Ct. App. 1984).  Plaintiff's allegations support a claim under either test.

Plaintiff alleges that Defendants misrepresent that their customers will enjoy unfettered access to all internet applications while at the same time severely limiting access to certain applications.  Complaint, ¶ 95.  Plaintiff alleges that this conduct is immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and the Class.  *Ibid.*  Plaintiff alleges that he and the Class have suffered damage by paying full cost for unrestricted Service, yet receiving only a restricted one.  *Id.* ¶ 98.  Plaintiff further alleges that the harm to Plaintiff and the Class resulting from Defendants' conduct outweighs any harm to Defendants from forbearance of such conduct.  *Id.* ¶ 95.

Defendants argue that any harm to Plaintiff and the Class is outweighed by the business justification of "network management."  Motion, p. 17.  However, Defendants do not and cannot explain any business justification for failing to inform their customers that they block or interfere with the Blocked Applications.  In fact, after the Complaint was filed, Defendants demonstrated that they are perfectly capable of making such a disclosure when they revised the AUP to specifically state that Defendants interfere with P2P file sharing applications.  Burying such a disclosure in a 12-page AUP that a customer must search for on Defendants' website does not ameliorate the harm flowing from Defendants' conduct.  However, it does demonstrate that there is no justification for Defendants failure to include such a disclosure in their advertising or

1    contracts prior to the filing of the Complaint.[11]

2    Defendants further claim that "the FCC has explicitly decided to permit

3    reasonable network management," and that such a decision insulates Defendants from a UCL

4    unfair claim.  Motion, p. 17:16-17.  Defendants miss the point.  Even if the FCC did permit

5    Defendants to manage their network by interfering with certain applications (which it has not),

6    neither the FCC nor any other body could or would condone Defendants' practice of promising

7    to provide unrestricted internet access to their customers, while at the same time secretly

8    restricting such access.

9    Additionally, Plaintiff alleges that Defendants' conduct violates the legislative

10   policy of the CLRA.  *Id.* ¶ 96.  Defendants' representations regarding unrestricted high speed

11   access are false and misleading given Defendants' admitted interference with the Blocked

12   Applications.  Since this violates the CLRA policy against misrepresenting the benefits and

13   quality of services, such conduct also constitutes unfair acts under the UCL.  *See* Cal. Civ. Code

14   §§ 1770(a)(5), 1770(a)(7), 1770(a)(9); *and Cel-Tech Communications, Inc.*, 20 Cal.4th at 187.

15   **B.    Primary Jurisdiction Does Not Apply.**

16   Defendants ask the Court to stay or dismiss Plaintiff's entire case based on the

17   pendency of several proceedings before the FCC.  The Court should decline this request as the

18   questions of California law regarding Defendants' alleged breach of contract, false advertising

19   and unfair competition do not involve complex issues outside the scope of this Court's

20   competency.

21   **1.    Plaintiff's Claims Raise Straightforward Issues Of Contract
     Interpretation And False Advertising That Do Not Require Agency
22   Expertise To Resolve.**

23   A case may be stayed or dismissed on primary jurisdiction grounds only where a

24   case presents a complex policy issue that requires agency expertise or uniformity in

25   _____

26   [11]     *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (Cal. Ct. App. 2006),
     relied on by Defendants, is inapposite.  *See* Motion, p. 17.  In *Bardin*, the plaintiff did not allege that
     defendant made any representations regarding the composition of the exhaust manifolds at issue in
27   that case that were contradicted by Defendants' conduct.  *Id.* at 1270.  Here, the opposite is true.
     Plaintiff's claims revolve around the contradiction between Defendants' representations and their
28   conduct.

administration.  *See Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002).  The primary jurisdiction doctrine focuses on whether Congress intended that the particular issues raised by a pending case should be addressed in the first instance by a regulatory agency with appropriate expertise.  *See United States v. Culliton*, 328 F.3d 1074, 1082 (9th Cir. 2003); *and Dahl v. Hem Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 (9th Cir. 1987) (emphasizing "importance of ensuring Congressional intent to place the initial consideration of an issue with an agency before finding that judicial deferral is warranted").  The primary jurisdiction doctrine is inapplicable here since resolution of Plaintiff's state law claims will not require the Court to delve into complex, technical issues within the unique competence of the FCC, and since there is no indication Congress intended the FCC to be the initial arbiter of false advertising and breach of contract claims against internet service providers.

Courts routinely reject primary jurisdiction arguments where the issues are within the traditional scope of the judiciary.  In *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290 (1976), the Supreme Court rejected the defendant airline's primary jurisdiction argument since "[t]he standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of this case."  *Id.* at 305-6; *see also Rhoades v. Avon Products, Inc.* 504 F.3d 1151, 1164 (9th Cir. 2007) (primary jurisdiction doctrine "is sensible only if the agency is better equipped [than the court] to handle the action.").

Courts in this District have followed suit, rejecting primary jurisdiction arguments in numerous cases involving breach of contract, false advertising and unfair competition claims.  In *Redding v. MCI Telecommunications Corp.,*1987 WL 486960 (N.D. Cal. 1987), the court found that a case against a telecommunications company for breach of contract, misrepresentation, restitution, false advertising and unfair business practices raises issues that "are traditionally within the competence of courts to decide," and refused to defer to the FCC on such claims.  *Id.* at *3.  Likewise, this District refused to defer to the FDA where the underlying

1    claims, though based on drug sales, were for false advertising and unfair competition.  *See In re*

2    *Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, 2006 WL

3    2374742, *12 (N.D. Cal. 2006) ("The issue is whether . . . Pfizer . . . falsely claimed that

4    Celebrex was superior.  Courts and juries frequently decide similar false advertising claims.").

5    Other districts have reached the same conclusion.  *See, e.g., Dahl*, 7 F.3d at 1404 (no primary

6    jurisdiction for breach of contract claim); *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*,

7    436 F. Supp. 2d 1095, 1106 (C.D. Cal. 2006) (no primary jurisdiction for claims alleging

8    fraudulent, deceptive and unfair practices); *and In re Paxil Litigation*, 2002 WL 31375497, *2

9    (C.D. Cal. 2002) ("The question of how members of the general public are likely to interpret (or

10   misinterpret) a statement is within one of the courts' core competencies.")[12]

11          To resolve Plaintiff's claims, the Court will be performing traditional judicial

12   functions such as construing the terms of Defendants' contracts and determining the reasonable

13   consumer expectations created by Defendants' advertising.  The fact that the underlying subject

14   matter of Defendants' alleged false statements and contractual breaches concerns internet

15   communication, which falls under FCC regulation, does not render the primary jurisdiction

16   doctrine applicable.  "The doctrine does not require that all claims within an agency's purview

17   be decided by the agency.  Nor is it intended to secure expert advice for the courts from

18   regulatory agencies every time a court is presented with an issue conceivably within the agency's

19   ambit."  *Brown,* 277 F.3d at 1172 (citations and quotations omitted).

20          *In re Genentech, Inc. Securities Litigation, Inc.*, 1989 WL 106834 (N.D. Cal.

21   1989), a securities case alleging that the defendant made material misrepresentations and

22   omissions regarding an FDA-approved drug, is instructive.  Since most of the alleged omissions

23   involved complex medical and pharmacological issues within the FDA's expertise, defendant

24   _____

25   [12]      Unlike the straightforward state law claims involved in this case, those at issue in
     *GTE.net LLC v. Cox Communications, Inc.*, 185 F. Supp. 2d 1141 (S.D. Cal. 2002), and other cases

26   relied on by Defendants involved complex regulatory matters.  For example, in *GTE.net*, the issue
     was ***not*** whether the defendant breached its contracts with its customers, but whether the defendant
     should be subject to regulation as a "telecommunications service" under the FCA.  *Id.* at 1144.  The

27   court found that, given widespread disagreement over the proper regulatory classification of internet
     service, such a determination is best left to the FCC.  *Ibid.*; *see also, Clark v. Time Warner Cable*

28   *Co.*, -- F.3d --, 2008 WL 1885691 (9th Cir. 2008) (same).

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

argued that the court should dismiss the case on primary jurisdiction grounds.  *Id.* at *1.  The

court disagreed, finding that a contrary result would lead to the absurd result that:

> every time a public company in any industry, regulated by an
> executive agency with subject matter expertise, was accused of
> harming its investors by making false statements about some part
> of its business which implicate the relevant expertise of the
> agency, a defendant could oust a federal court of its jurisdiction
> and transfer its suit to a federal agency.

*Ibid.*  Similarly, Defendants' argument that the Court should defer to the FCC here because the

network management issues that are implicated by Plaintiff's complaint may fall within FCC's

jurisdiction, would lead to the bizarre conclusion that any breach of contract or false advertising

case against a telecommunications company potentially involving technical issues would be

diverted to the FCC.  There is no indication that Congress intended this absurd result.[13]

**2.  Staying Or Dismissing This Action In Hopes That FCC Will Act Take Will Not Serve The Purposes Of The Primary Jurisdiction Doctrine.**

Ultimately, the determination of whether to defer to an agency pursuant to

primary jurisdiction hinges on the extent to which the application of the doctrine would serve

two underlying policies: (1) whether application will enhance court decision-making and

efficiency by allowing the court to take advantage of administrative expertise; and (2) whether

application will help assure uniform application of regulatory laws.  *Chabner v. United of

Omaha Life Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir. 2000) (citations and quotations omitted).

Staying or dismissing Plaintiff's case would not serve these purposes.  First, as detailed above,

this Court is well equipped to address the contractual and false advertising issues raised by

Plaintiff's Complaint, none of which require FCC expertise.  Second, since each internet service

provider uses its own form of contract and its own advertising, there is no issue of uniformity in

construing the meaning of Defendants' contracts and the legality of their advertising practices.

---

[13]    To the contrary, Congress has expressly indicated in the Federal Communications Act that it did not intend "in any way abridge or alter the remedies now existing at common law or by statute," and that "the provisions of this chapter are in addition to such remedies."  47 U.S.C. § 414; *see also Comtronics, Inc. v. Puerto Rico Tel. Co.*, 553 F.2d 701, 707 n.6 (1st Cir. 1977) (reading section 414 as "preserving causes of action for breaches of duties distinguishable from those created under the Act, as in the case of a contract claim.").

1    Indeed, rather than promoting efficiency or uniformity, staying or dismissing this

2    action while awaiting FCC action is only likely to lead to unnecessary delay. To support their

3    primary jurisdiction argument, Defendants ignore the thrust of Plaintiff's Complaint and focus

4    instead on a single issue raised by one portion of Plaintiff's Complaint. Specifically,

5    Defendants' entire primary jurisdiction argument is limited to the issue of whether their practice

6    of degrading their customers' use of peer-to-peer applications violates the FCC's Internet Policy

7    Statement. Motion, pp. 10-11. Although this issue is raised by Plaintiff's Complaint, it only

8    arises in connection with one of four predicate unlawful acts alleged in Plaintiff's Sixth Cause of

9    Action for the commission of unlawful business practices and as one of several factors

10    supporting his claim for unfair business practices under the UCL. In other words, Defendants

11    are asking the Court to dismiss or stay Plaintiff's *entire case* based one a *single issue* that only

12    arises in connection with a ***portion of two*** of Plaintiff's claims.[14] Since the FCC is not

13    addressing the gravamen of Plaintiff's Complaint – that Defendants breached their contracts with

14    and misled their subscribers – awaiting FCC action here makes no sense.

15    Nor is the FCC likely to act on this single overlapping issue any time soon. The

16    FCC has consolidated all three of the proceedings cited by Defendants under Docket Number 07-

17    52, which was established by the FCC over a year ago via a "Notice of Inquiry" in which FCC

18    sought to "enhance [its] understanding" of certain issues relating to the market for broadband

19    and related services. NOI, 22 F.C.C.R. 7894, ¶ 1 (March 22, 2007). The Notice of Inquiry

20    indicates that the FCC is still considering "whether any regulatory intervention is necessary,"

21    and one FCC commissioner has chastised his colleagues for taking such a "tiny, timid step" and

22    for their "leisurely" approach. *Id.* at ¶ 1 & p. 10 (concurring statement of Commissioner

23    Michael J. Copps). Indeed, although they have been consolidated under a 2007 docket, the three

24    proceedings cited by Defendants date back to at least the year 2000, when the FCC issued an

25    "Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities." *See In*

26

27      [14]    As discussed above *supra* note 1, Plaintiff intends to amend his Complaint to
28    eliminate any references to the FCC Internet Policy Statement, thereby rendering the FCC
         proceedings irrelevant to all of Plaintiff's claims.

1  *re Petition of Free Press, et al.*, WC Docket No. 07-52 (Defendants' RJN, Exh. 5).[15]

2          **3.      Plaintiff and the Putative Class Would Be Prejudiced by A Stay Or Dismissal.**

3

4          The blanket stay requested by Defendants of this entire proceeding would result

5  in delay of Plaintiff's action for an indeterminate period of time, pending resolution of FCC

6  proceedings that could take years, that are focused on only one small aspect of a portion of

7  Plaintiff's case, and that may never address even that single issue.  Because this delay will

8  prejudice Plaintiff and the putative class members, the Court should refuse Defendants' request.

9          In addition to the primary jurisdiction factors discussed above, courts assessing

10  whether to stay a case on primary jurisdiction grounds also consider general principles governing

11  stay requests.  As one court stated:

12          the Court must weigh the benefits of obtaining the agency's aid
            against the need to resolve the litigation expeditiously.  In addition,
13          a court should take into consideration the possible damage which
            may result from the granting of a stay, the hardship or inequity
14          which a party may suffer in being required to go forward, and the
            orderly course of justice measured in terms of the simplifying or
15          complicating of issues, proof, and questions of law which could be
            expected to result from a stay.  [A party seeking] a stay must make
16          out a clear case of hardship or inequity in being required to go
            forward, if there is even a fair possibility that the stay for which he
17          prays will work damage to someone else.
18
19  *Natural Res. Def. Council v. Norton*, 2007 WL 14283, *14 (E.D. Cal. 2007) (*citations and

20  quotations omitted*).

21          Here, Defendants do not claim they will suffer hardship or inequity by being

22  forced to defend this action.  On the other hand, the protracted delay sought by Defendants

23  would significantly threaten Plaintiff's ability to pursue this action and obtain injunctive relief

24  _____

25          [15]      In one of the proceedings cited by Defendants, a coalition of advocacy groups and
    academics asked the FCC to clarify that secretly degrading an internet application constitutes a
    deceptive business practice.  *See In re Petition of Free Press, et al.*, WC Docket No. 07-52, p. iii
26  (Defendants' RJN, Exh. 5).  However, none of the FCC public notices cited by Defendants seek
    comment on this topic, and Defendants have explicitly challenged FCC's authority "to promulgate
27  rules that address allegedly deceptive practices."  Comments of Comcast Corporation, WC Docket
    No. 07-52, p. 50.  Thus, even if FCC takes action on this request, Defendants will likely challenge
28  such action as beyond FCC's authority, which will only lead to further delay.

1 and monetary redress for himself and the putative class members.  The memories of witnesses

2 are likely to fade, evidence and documents may become lost or disappear, and witnesses may die

3 or become unavailable during a stay, making it significantly more difficult for Plaintiff to litigate

4 his case.  *See Southwest Marine, Inc. v. Triple A Machine Shop, Inc*., 720 F. Supp. 805, 809

5 (N.D. Cal. 1989).  The passage of time will also render it increasingly difficult to identify and

6 locate the members of the putative class, making it less likely they will recover any of the

7 monetary compensation sought by this litigation.  Furthermore, although Defendants have made

8 some changes to their contracts and disclosures to consumers since this suit was filed, those

9 changes are insufficient and, absent an injunction, there no guarantee that even those changes

10 will remain in place.

11 The mere possibility that the FCC may one day act to determine whether

12 interfering with peer-to-peer applications violated its internet policy statement is not a reason to

13 indefinitely stay or dismiss these proceedings.  Staying this case in deference to the FCC will

14 only lead to unnecessary delay at the prejudice of Plaintiff and the putative class, and will not

15 materially assist the Court's resolution of the underlying issues.  Because the Court is well-

16 equipped to address the straightforward breach of contract, false advertising, and unlawful

17 business practices claims asserted in the Complaint, most of which are not even part of the FCC

18 proceedings relied upon by Defendants, the primary jurisdiction doctrine does not apply here.[16]

19  **C.  The Communications Decency Act Does Not Preempt Ordinary Issues of
20   Contract and Unfair Competition Law.**

21 Defendants argue that the CDA preempts Plaintiff's claims because "Congress

22 has expressed its intent to preempt state regulation of the internet."  Motion, p. 13:24.  This

23 precise argument has been uniformly rejected, as courts recognize that "[t]he Communications

24 Decency Act was not meant to create a lawless no-man's-land on the Internet."  *Fair Housing*

25

26 [16]  For the reasons set forth above, Defendants' primary jurisdiction argument should
be rejected in its entirety.  However, to the extent the Court is inclined to refer any of the case to the
27 FCC, the referral and stay should be limited to the single issue of whether Defendants' practice of
interfering with their customers' use of peer-to-peer applications violates the FCC's internet policy
28 statement. *See Jones v. Rose*, 2005 WL 2218134, *29 (D.Or. 2005) (referring single issue to agency
while remaining case proceeds).

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

1   *Council of San Fernando Valley*, 2008 WL 879293 at *3. Rather, the CDA was enacted to

2   "forbid the imposition of publisher liability on a service provider for the exercise of its editorial

3   and self-regulatory functions." *Anthony v. Yahoo Inc.*, 421 F. Supp. 2d 1257, 1262 (N.D. Cal.

4   2006). Here, Plaintiff's claims do not attempt to hold Defendants liable for publishing or

5   filtering obscene or indecent content. Accordingly, Plaintiff's claims are not preempted by the

6   CDA.

7          Under any preemption analysis, "the purpose of Congress is the ultimate

8   touchstone." *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (internal citations omitted).

9   Accordingly, when considering a preemption defense, a court's job is "to determine whether

10  state regulation is consistent with the structure and purpose of the statute as a whole." *Ibid.* The

11  structure and purpose of the CDA do not support preemption of Plaintiff's state law claims for

12  breach of contract, false advertising and unfair competition.

13         "The primary goal of the Act [CDA] was to control the exposure of minors to

14  indecent material." *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003). However, Congress

15  did not want to stifle internet innovation by allowing service providers to be held liable for

16  indecent content accessed via their services. *Id.* at 1026-1027. Congress thus struck a balance

17  between "promoting free speech while at the same time giving parents the tools to limit the

18  material their children can access over the internet." *Id.* at 1028. Accordingly, when Congress

19  stated that one of the policies of CDA is "to preserve the vibrant and competitive free market

20  that presently exists for the Internet and other interactive computer services, unfettered by

21  Federal or State regulation," it did not mean to immunize ISPs from all regulation and liability,

22  but only from certain types of publisher liability. *Id.* at 1028-1029. Likewise, by expressly

23  preempting "State or local law that is inconsistent with this section," Congress meant only to

24  extend the immunity provided to ISPs from liability as a publisher of third party content to the

25  states. *Ibid.* at 1029-1030 (*citing* 47 U.S.C. 230(e)(3)). CDA immunity and related preemption

26  are in no way meant to bar liability or state claims regarding the creation of content by an ISP.

27  *See, e.g., Fair Housing Council,* 2008 WL 879293 at *2; *and Anthony,* 421 F. Supp. 2d at 1262-

28

PLAINTIFF'S OPP. TO COMCAST MOT. FOR JUDG ON PLEADINGS - Case No. C-07-06350 PJH

1    63.

2           Here, Plaintiff is not seeking to hold Defendants liable as a publisher of third-

3    party content.  Rather, Plaintiff seeks to hold Defendants liable for breaching contracts (content)

4    *they* drafted and for running advertisements *they* drafted which are likely to deceive their

5    customers.  Accordingly, the CDA does not preempt Plaintiff's claims.

6                              **IV.    CONCLUSION**

7           Plaintiff's Complaint adequately alleges traditional state law claims for breach of

8    contract, false advertising and unfair competition.  Plaintiff's claims all arise from Defendants'

9    false promises to provide him and the Class with "unfettered" and "high-speed" internet access

10   while at the same time restricting access and connection speeds for Plaintiff and the Class.

11   Resolution of these claims fall within the traditional powers and competency of this Court, and

12   do not require the expertise of the FCC.  Nor do these claims conflict with the immunity for ISPs

13   from liability as a publisher created by the CDA.  Accordingly, neither primary jurisdiction nor

14   preemption serve to bar this Court from adjudicating Plaintiff's claims.  For all of the reasons set

15   forth herein, Plaintiff respectfully requests that the Court deny Defendants' Motion.

16

17   Dated: May 7, 2008                    LEXINGTON LAW GROUP, LLP

18

19

20                                         /s/ *Mark N. Todzo*
                                           Mark N. Todzo
21                                         Attorneys for Plaintiff
                                           JON HART
22

23

24

25

26

27

28